C. D. MORRISON, Respondent, v. ALVIRAS E.
SNOW, L. W. SNOW, MORTON FRENCH and
THE MORRISON MINING COMPANY, a Cor-
poration, Appellants, and GEORGE W. BARTCH,
Respondent.

No. 1460.    (72 Pac. 924.)

1. Corporations: Transfer of Stock: Cancellation: Fraud:
   Jury Trial: Nature of Action.
   A suit to set aside a transfer of corporate stock because of the
   transferee's fraudulent representations, for an injunction re-
   straining persons holding the stock in trust for the transferee
   from disposing of the same, and for a decree compelling the de-
   livery of the certificates representing the stock and requiring
   the corporation to reissue the stock to plaintiff, is exclusively
   an equitable action, and neither party has a right to a jury trial.

2. Same: Findings: Evidence: Insufficiency.
   In a suit to set aside a transfer of stock of a mining corporation,
   it appeared that the seller kept himself advised as to the ap-
   pearance and general condition of the mine, and had some
   knowledge of the amount and character of the ore it was produc-
   ing; but he had no knowledge of the financial condition of the
   corporation, except what the transferee of the stock told him.
   The seller resided several hundred miles from the place where the
   corporation books were kept and the general business transacted.
   The transferee was a dealer in mines and mining stock, and as
   secretary and treasurer of the corporation kept its books, and
   as business manager had almost absolute control of its business.
   Held, that the seller of the stock and the transferee were not
   at the time of the transfer on an equal footing.

3. Same:
   Before the transfer, the transferee employed a mining expert, who
   examined the property and reported to him that with little ef-
   fort the mine could be worked at a profit. The transferee re-
   quested the expert not to converse with any one about the valua-
   tion of the property, explaining that he was desirous of purchas-
   ing more stock from a man in the company. At this time the
   seller was the only person, except the transferee, who held

stock. The seller was not advised of the expert's favorable report, but was falsely informed by the transferee that the mine had not turned out as expected, that it would not pay to make a shipment of ore, that it would be necessary to have an assessment on the stock, and that transferee was out about $2,000 for money advanced to pay expenses. The transferee also falsely informed the seller that he was unable to sell any of the treasury stock. *Held*, sufficient to show that the seller was induced to make the transfer by fraudulent representations.

4. **Courts: Scandalous Matter: Power to Expunge.**

A court has the power to expunge from its records scandalous matter, which raises no issue and serves no purpose, except to injure the reputation of the parties at whom it is aimed.

5. **Same: Charge of Misconduct against Judge: Evidence Held Insufficient to Sustain.**

A defendant in his answer alleged that one of the judges of the Supreme Court conspired with plaintiff, and used the weight of his personal and judicial influence to induce plaintiff to bring the suit; that the suit was the result of a conspiracy between the judge and plaintiff for the sole purpose of gratifying the malicious instincts of the judge; and that the fruits of the suit should be divided between the judge and plaintiff. The only evidence showing the judge's connection with the suit was that plaintiff called on the judge at his residence, and that the judge advised plaintiff not to sue, but to see defendant and have the matter settled. *Held*, insufficient to sustain the charge or to show any impropriety on the part of the judge.

6. **Same: Attorneys: Duties.**

Under Revised Statutes, section 113, subdivisions 2, 4, 6, providing that it is the duty of an attorney to maintain the respect due to courts of justice and judicial officers, to employ for the purpose of maintaining causes confided to him such means only as are consistent with truth, and to abstain from all offensive personalities, an attorney, as a party to an action, is prohibited from knowingly making defamatory charges against a judge.

7. **Same: Revocation of License.**

The court, under the express provisions of Revised Statutes, section 120, has the power to revoke the license of an attorney violating the provisions of the statute regulating attorneys and counselors.

(Decided July 1, 1903.)

Appeal from the Third District Court, Salt Lake County.—*Hon. W. C. Hall,* Judge.

Action to set aside and rescind a contract which the complaint alleges plaintiff, through certain false and fraudulent representations made to him by defendant, Alviras E. Snow, was induced to enter into, whereby he sold to Snow for a nominal consideration 145,000 shares of the capital stock of the Morrison Mining Company; for an injunction restraining the defendants, L. W. Snow and Morton French, from disposing of the stock, which, it is alleged, they hold in trust for said Alviras E. Snow, and to compel them to deliver up for cancellation the certificates representing the stock; and to compel the Morrison Mining Company to reissue the said stock to plaintiff. From a decree in favor of the plaintiff, and from a decree striking certain scandalous matter from the records of the court, the defendants appealed.

AFFIRMED.

*W. H. Wilkins, Esq.,* and *J. M. Bowman, Esq.,* for appellants.

*Messrs. Dickson, Ellis & Ellis* for respondent.

*Messrs. Powers, Straup & Lippman* for respondent Bartch.

### STATEMENT OF FACTS.

This action is brought, first, to have rescinded and set aside a written contract which the complaint alleges plaintiff, through certain false and fraudulent representations made to him by defendant Alviras E. Snow, was induced to enter into, whereby he sold and delivered to Snow for a nominal consideration 145,000 shares of the capital stock of the Morrison Mining Company, of

the value of $7,250; second, for an injunction restraining the defendants L. W. Snow and Morton French from disposing of the stock, it being alleged that they are holding it in trust for Alviras E. Snow; and, third, for a decree compelling them to deliver up for cancellation the certificates representing the stock, and that the Morrison Mining Company be directed to reissue the stock to plaintiff. There is a conflict in the testimony on some of the issues, but the following facts are supported by a clear preponderance of the evidence:

On April 12, 1900, at Humboldt, Nevada, plaintiff and defendant Alviras E. Snow entered into the following contract in writing: "This agreement, made and entered into this 12th day of April, 1900, by and between C. D. Morrison, of Humboldt, Nevada, party of the first part, and A. E. Snow, of Salt Lake City, Utah, party of the second part, witnesseth: That for and in consideration of one dollar to him in hand paid, receipt whereof is hereby acknowledged, the party of the first part agrees to deed (by quitclaim), within thirty days from date, to A. E. Snow, in trust for the Morrison Mining and Milling Company, a corporation to be hereafter organized under the laws of the State of Utah, the following described mining claims in Humboldt mining district, Humboldt county, State of Nevada, to-wit: The Concordia, the North Concordia, the South Concordia, and the West Concordia. The second party to incorporate said mining company at his own expense, with a capitalization of four hundred thousand shares— one hundred thousand shares to remain in the treasury as working capital, and the remaining three hundred thousand shares to be divided equally between the said C. D. Morrison and A. E. Snow. [Signed] A. E. Snow." At the time of making the contract Morrison and Snow agreed that they would not dispose of the stock held by them individually, but would sell the treasury stock to raise funds with which to work and develop the mines mentioned in the contract. The reason assigned for making this agreement was that to put

their own'stock on the market would interfere with the sale of the treasury stock.

Morrison was in the constant and continuous employ of the railroad company at Humboldt as a car repairer and inspector of trains. The rules of the company prevented him from actively engaging in business on his own account. He therefore had neither the time nor opportunity to promote and organize a company to develop the property. Snow resided in Salt Lake City, Utah, and was engaged in mining and in promoting mining enterprises. About April 20, 1900, Morrison, in compliance with the terms of his agreement with Snow, executed and delivered to Snow a quitclaim deed to the mines in question. Snow took charge of the property, and his first move toward organizing a company was to approach and get interested in the enterprise several prominent and influential men of this State, among whom were Justice Bartch, Justice Miner, Judge Rolapp, H. B. Clawson, and Ezra Thompson, mayor of Salt Lake City. According to his own testimony, as shown by the record, Snow bargained and sold to these gentlemen, and other parties who were to come into the company, 70,000 shares in the aggregate of his own stock, at two cents per share, to be issued and delivered on the completion of the organization of the company. After the sale of this stock, and before the company was organized, Snow informed Morrison that he gave the parties mentioned their stock to induce them to come into the company. The articles of incorporation were signed, and the organization of the company completed, March 6, 1901, with its principal place of business at Salt Lake City, Utah. Morrison and Snow were made members of the board of directors. All of the directors, except Morrison, resided in Salt Lake City. Snow was made secretary and treasurer, and continued to manage and direct the affairs of the company. Snow occasionally received samples of ore from the mine, and kept himself well posted as to its appearance and condition, and as to the value of the ore taken therefrom. On the

7th day of May, 1901, a Mr. Baldwin, who was a practical mining man, went, in company with Snow, and made an examination of the property, and took therefrom eight samples of ore, which he assayed, and on the 14th day of May, 1901, made the following concise report of the appearance and condition of the mine and the character of the ore it was producing: "This will very readily show [referring to the tests made and the different bodies of ore from which the samples were taken, some of which assayed as high as $296 per ton] that there is at least from $5,000 to $7,000 worth of ore on the dumps on the mine, and I am led to believe, if carefully sorted, there could be gotten out of the dump $1,500 or $2,000, and I am positive the mine could be handled at a profit at present on this basis. So, if you people will submit me a proposition, I will entertain the same on a fair basis, as I will say I fully believe that the merits of the Morrison are very good from what I have seen. But for the property in whole, that is yet to be demonstrated."

The result of these and other assays that Snow had made of the ores taken from the mine, after he assumed control, were never communicated to Morrison, who had no information as to the actual value of the ore. The distance from Salt Lake City to Humboldt is about 500 miles, making it both expensive and inconvenient for Morrison to make frequent visits to look after his interests, and, as shown by the record, he not only expected, but trusted to, Snow to attend to and look after the business of the company. Snow, whose duty it was, as secretary of the company, to notify the several directors of board meetings, never sent Morrison but one notice of a board meeting, and on this occasion he wrote Morrison, if he could not come, to put his views in writing, which Morrison did. Snow knew that Morrison was placing the utmost confidence in him, and expecting him to attend to and take care of his interests and that of the company. Their correspondence, which is too voluminous to produce here in full, shows this fact.

On June 18, 1901, Morrison wrote to Snow, in part, as follows: "I don't know what you have done at that end, but from the tone of your letter you are not encouraged. . . . If the directors are not in harmony with you and your judgment, ask them to resign and fill their places the best you can. We have considerable good ore on the dump, also a good deal that can be taken out, both from the face and back in the drift. It can and will pay expenses right along, if it had a little life put in it. . . . I firmly believe that in sixty days I could ship a car of ore that would net $1,000; but I would have to have charge myself. This could be arranged by your writing to Mr. Sibley that I have this day been appointed managing director. . . . Rustle a little, and see if we can't do more good for ourselves in the next two months than we have done in the last six months." In answer to this letter Snow, on July 1, 1901, wrote to Morrison as follows: "I will be out about $2,000 by the time I settle up with Sibley. This proposition has not panned out as I expected; but, of course, I am not blaming any one for that but myself. However, I don't feel that I can afford to sink very much more money. So far as making a shipment now is concerned, I do not think it will pay. If there is any way to arrange for the future work without having to put up all the money myself, I would like to do it. Are you fixed so that you can pay a small assessment, say about one-half a cent per share? That will give us $1,500, and I will wait further developments for what the company owes me." On July 3, 1901, Morrison wrote to Snow, and informed him that he was not prepared to pay an assessment, and that he would let Snow have his 150,000 shares of stock for $1,500.

Soon after Snow went to Humboldt, where, on July 12th, he met Morrison, and entered into negotiations with him for the purchase of his stock. He informed Morrison that he had been unable to sell any of the treasury stock; "that he could not give it away;"

that he did not think the ore at the mine would pay to ship; that he was out about $2,000, money he had advanced to pay the running expenses of the company; and that an assessment of the outstanding stock was imperative, and offered Morrison $500 for 145,000 shares of his stock, saying at the time: "I wish some one would make me a similar proposition, so I could get my money out of it." The record shows that prior to this time 30,000 shares of the treasury stock had been sold, and $600 realized therefrom, and that the capital stock of the company was worth on the market in Salt Lake City from 5 to 6 cents per share; that Snow was not out a cent, but that, on the contrary, he was ahead more than $1,400 on his investment; that the indebtedness of the company was not more than $700 or $800; that the indebtedness, if any, of the company to Snow, was only nominal; that there was more than sufficient ore at the mine, that would pay to ship, to more than pay off the entire indebtedness of the company; that an assessment was not necessary, nor had one been contemplated. All of these facts were known to Snow at the time. Morrison, believing and relying upon the statements and representations made by Snow, accepted his offer of $500. Snow gave Morrison a check for $100, and four promissory notes, of $100 each, payable thirty days apart, in payment of the stock. Morrison gave Snow an order on the company for the stock, which had never been issued to him. Snow agreed to pay all assessments on Morrison's remaining 5,000 shares of stock for the year 1901.

About September 3, 1901, Morrison for the first time learned through one of the directors of the company that Snow had sold, and had not given away, his stock, of the falsity of his statements and representations respecting the amount of the indebtedness of the company, the proposed assessment on the outstanding stock, the worthlessness of the treasury stock, and the alleged indebtedness of the company to him. Morrison, on receiving this information, went direct to Snow, and

in the presence of witnesses accused Snow of having lied and defrauded him of his stock, and tendered to him the money and notes received from him in payment of the 145,000 shares of stock. Snow at the time made no denial of the accusations of fraud, deceit, and dishonesty made against him by Morrison. Snow refused to return the stock, or any part of it, but soon after, without any consideration whatever, transferred the stock in question to his brother, L. W. Snow, and Morton French, for the purpose, as shown by the record, of placing it beyond the reach of the process of the court in case Morrison should bring suit and obtain a judgment for its return On October 5, 1901, Morrison filed his complaint in equity against the defendants, setting forth in detail the foregoing facts. L. W. Snow and Morton French made default. Alviras E. Snow answered, and denied the allegations of plaintiff's complaint relied on for a recovery, and in his answer he charged Justice Bartch, who was at the time and is now a member of this court, with having "conspired and confederated with said Morrison, and of having used the weight of his personal as well as judicial influence to induce the said Morrison to bring this, his said suit; that the said suit is colorable, and is not a bona fide suit, but is brought, and is the result of a conspiracy between the said Bartch and the said Morrison, for the sole purpose of gratifying the malicious instincts of said Bartch," and "it is agreed between them that the fruits resulting from this suit, if any, shall be divided between the said Bartch and the said Morrison."

The court found on all the issues of the main case in favor of Morrison, and entered a decree rescinding and cancelling the contract mentioned, and directed and required L. W. Snow and Morton French to surrender and deliver up for cancellation the certificates representing the shares of stock in question, and directed the Morrison Mining Company to cancel the certificates, when surrendered, and reissue in lieu thereof

a certificate of the stock to plaintiff. On the issues raised by the charges made against Justice Bartch the court found "that he never advised nor procured this suit to be commenced, but, on the contrary. advised that it should not be commenced and endeavored to procure the same to be amicably settled, and never in any way abetted or induced the bringing of this case, and never in any way influenced the plaintiff in relation to the same, and has no interest in the fruits of this suit, and all such allegations in the answer of Alviras E. Snow are false, and made without foundation in fact, and are not sustained by any testimony whatever." As conclusions of law the court found "that the allegations in the answer of defendant Alviras E. Snow of and concerning George W. Bartch are scandalous and malicious, and that the same be by order and decree of this court stricken from the files and records of this court as scandalous, malicious, and impertinent." A decree was entered in accordance with the findings and conclusions, and the scandalous and impertinent matter referred to stricken from the files and records. Defendants, Alviras E. Snow, L. W. Snow, Morton French, and the Morrison Mining Company, appeal.

McCARTY, J., after stating the foregoing facts, delivered the opinion of the court.

In considering the issues raised by this appeal we will first determine the questions that pertain to the main branch of the case, and then dispose of those involving the action of the trial court in striking from its files and records the allegations in defendant Alviras E. Snow's answer against Justice Bartch.

Appellants complain of and assign as error the refusal of the court to grant them a trial by jury. There is no merit whatever in this assignment, and, were it not that counsel for appellants appear to be serious in their contention on this point, and have devoted much space in their brief to the discussion of the question, we would be disposed to pass it by

without considering it. Counsel's contention, as we understand it, is, first, that respondent, Morrison, had a complete remedy in an action at law, and should have pursued this remedy, and, not having done so, the appellants cannot be deprived of a trial by jury. A party who has been induced by fraudulent representations to sell and dispose of his stock in a corporation has two remedies. He may bring an action for damages for the fraud, or he may bring a suit in equity to have the sale set aside. Cook on Stocks & Stockh., sec. 354; Vail v. Reynolds, 118 N. Y. 297, 23 N. E. 301. From the very nature and character of this suit, it is evident that the legal remedy would be wholly inadequate, and that a court of equity alone can grant the relief for which the action is brought. It being exclusively an equitable action, the court did not err in refusing to submit the issues to a jury.

Appellants further allege in their assignments of error that the findings and decree are not supported by the evidence in the following particulars: First, they allege that the evidence shows that the truth or falsity of the alleged fraudulent representations upon which the action is based was equally within the knowledge of both Morrison and Snow, and, second, that Morrison, in disposing of his stock to Snow, acted upon his own judgment and with full knowledge of all the facts respecting the financial condition of the company and the value of the mine. The record shows that Morrison kept himself advised as to the appearance and general condition of the mine, and had some knowledge of the amount and character of the ore it was producing; but the record also conclusively shows that he had no knowledge whatever respecting the financial condition of the company, or the value of the stock, except what Snow told him. Snow was the trusted agent of the company, and the man to whom Morrison had given a one-half interest in a valuable mine, and later on deeded the entire property over to him. Snow

held the property in trust for nearly a year before the company was organized, with power to sell and dispose of it. The agreement was that, in case of a sale, the proceeds were to be equally divided between them. The uncontradicted testimony of Morrison on this point is as follows: "All I asked of him, when I made this deal, was that, if he made a dollar, he would give me half of it, and he said he would." This shows that their relations were those of confidence and trust. Snow himself says that Morrison kept him advised as to the condition of affairs in and about the mine. Their correspondence, which is very voluminous, a portion of which is set out in the statement of facts, shows that Morrison trusted and relied upon Snow to make the enterprise a success by creating a market for the stock. In fact he had, as already stated, given Snow a one-half interest in the property to do this. Snow himself testified on this point as follows: "Soon after the contract of April was entered into between Morrison and I, in talking over the affairs of the company, I stated to Morrison that I thought it would be well to list the stock on the board here after we got things in shape, and then I thought it would be well to pool our stock." Morrison never called for his stock, nor had it issued to him, thus showing that he was following the course outlined by Snow. Under these circumstances, and in view of the relations existing between them, Snow was both morally and legally bound to refrain from doing anything or making any representation in connection with their business to mislead or deceive Morrison, for the purpose of advancing his (Snow's) own interest to the injury of Morrison.

The contention that Morrison had an equal or better opportunity than Snow to know and understand the financial condition and affairs of the company and the value of the stock is not supported by the record, which shows that Morrison was a poor man, with a family, and had to keep constantly at work. He resided at a wayside station on the railroad 500 miles

from Salt Lake City, where the books of the company were kept and its general business transacted. Salt Lake was practically the only market where the stock could be sold. Morrison had never been in Salt Lake City, and, with the exception of a casual acquaintance he had with three or four of the stockholders, he was an entire stranger. Snow, on the other hand, was a dealer in mines and mining stock. As secretary and treasurer he kept the books of the corporation, and was its business manager, with almost absolute control of the business affairs. Under these conditions and circumstances, it is idle for counsel to contend that these men were on an equal footing when the deal complained of was made. When Snow represented to Morrison that the company owed him (Snow) about $2,000, and that the ore at the mine would not pay to ship, and that an assessment was contemplated by the company, Morrison was justified in believing and acting upon such representations; and Snow cannot be heard to say that, because Morrison was nominally a director in the company, he had either actual or implied knowledge of the actual facts and conditions, and therefore he should disbelieve the agent of the company, which was composed of some of the most eminent and honorable citizens, as well as substantial business men, of this State.

Furthermore, there is abundant evidence in the record that tends to show that the transaction under consideration was the culmination or final act of a scheme conceived by Snow, weeks before, to defraud Morrison out of his stock. Baldwin testified that when he sampled the mine, and the results showed that with little effort the mine could be worked at a profit, Snow requested him not to converse with any one about the valuation of the property, as he (Snow) was desirous of purchasing more stock from a certain man who was then in the company, and that, if Baldwin would say nothing favorable in his report about the mine, he (Snow) would make it an object to

him.   At this time Morrison was the only person, except Snow, who held any considerable amount of stock in the company, and the only man in the company who was not advised of the favorable report made on the mine by Baldwin.   After Snow had succeeded in getting the stock from Morrison, a shipment of ore was made from the mine of about two and one-half tons, which netted the company $967.50.   These facts, together with the numerous misrepresentations already alluded to, which the great preponderance of the evidence shows Snow made to Morrison to induce him to part with his stock, are ample to sustain the findings and judgment.

Appellant assigns as error the ruling of the trial court in striking from its files and records the allegations in the answer of the defendant Alviras E. Snow respecting Justice Bartch as scandalous, malicious, and impertinent.   The record shows that no evidence was introduced, nor was any offered, to support the allegations which the court struck from its files and records.   At and during the trial of the case the attorneys representing Justice Bartch challenged and demanded of appellants and their attorneys to prove the allegations referred to; but they declined to offer any testimony whatever, and none was offered in support of them.   Evidence, however, was introduced that affirmatively and conclusively proved that Justice Bartch never counseled, advised, or in any way influenced, or tried to influence, the plaintiff, Morrison, to commence the suit; and when Morrison informed the Justice that he (Morrison) intended to bring an action to recover his stock from Snow, he (Justice Bartch) advised Morrison not to commence an action, but to settle his differences with Snow amicably.   In fact, there is not one scintilla of evidence that would justify the slightest suspicion that the Justice in any way or manner used or attempted to use his personal, judicial, or any influence with Morrison, or any one connected with this suit, to induce its commencement.   Neither

appellants nor their counsel claim that there was evidence to support a finding against Justice Bartch, or that the trial court erred in dismissing the case as to him.    In the discussion of the main branch of the case they argued upon the theory that he did, as found by the trial court, advise against the bringing of the action. In support of one of the propositions advanced by them they say: "It is little wonder that he [Bartch] advised this plaintiff not to bring this suit."    And further along in their printed argument they again declare: "Again we say, is it any wonder that Mr. Justice Bartch advised plaintiff not to bring this suit?"

Counsel for the appellants do not claim that the judgment on this branch of the case should be reversed and a new trial granted.    The claim they make is that in the interest of future litigants the action of the trial court in striking the allegations referred to from the files and records should be reversed, and the objectionable matter reinstated; that is, if we understand their position, the appellants themselves were not prejudiced by the action of the trial court, and the appeal on this branch of the case is prosecuted in the interest of some future litigant, who may desire to spread upon the files and records of the courts of this State malicious, impertinent, and scandalous matters.    The contention of counsel, to say the least, is both novel and extraordinary; and, were it not that there are questions and principles involved in this branch of the case that materially affect the judiciary of this State, we would dismiss the matter without further consideration.    But, as the matters referred to contain grave and serious charges of misconduct, criminal in character, against a member of this court, and are made by a licensed attorney at law, who, as such, is an officer of the court, which charges the record shows are not only malicious, scandalous, and impertinent, but absolutely false, and evidently made for no purpose except to disgrace and bring such member into disrepute, we deem it our duty to take up and consider this branch of the case.

The issue thus raised is, has a court power to expunge from its files and records scandalous, malicious, and malignant matter injected therein, that raises no issue and can serve no purpose, except to harass, annoy, wound the feelings, and besmirch the reputation of the parties at whom it is aimed? In other words, must the doors of the judiciary be thrown wide open, and become a conduit through which the malevolence, vindictiveness, and offensive personalties of litigants and attorneys may be injected, and the files, records, and vaults of the courts become the public repositories in which to perpetuate such scandal? Every court has the inherent power to prevent libelous, impertinent, and scandalous matter from incumbering its records. It would, indeed, be a sad commentary on our judicial system, if courts were powerless to enforce proper decorum in all proceedings before them, and compel litigants and attorneys to observe the rules of propriety and common decency in the bringing and conducting of suits. In Green v. Elbert, 137 U. S. 615, 11 Sup. Ct. 188, 34 L. Ed. 792, the court, speaking through Chief Justice Fuller, says: "We regret to find ourselves compelled to add something further. The printed argument of plaintiff in error contained many allegations wholly aside from the charges made in his complaint, and bearing reproachfully upon the moral character of individuals, which are clearly impertinent and scandalous, and unfit to be submitted to the court. It is our duty to keep our records free from scandal. The brief of plaintiff in error will be stricken from the files, and the writ of error dismissed; and it is so ordered." In Johnson v. Brown, 13 W. Va. 153, the court, in considering this question, said: "The court of its own motion, in aid of public morals, is bound not to permit its records to be made the means of perpetrating libelous and malignant slanders, but should interfere to suppress such indecencies, which may stain the reputation and wound the feelings of the parties, their relatives and friends." In 19 Ency. Pl. and Pr.,

199, it is said: "Courts have inherent power to protect their records by striking out or expunging scandal and impertinence." See cases cited. The findings, conclusions, and decree of the court are fully sustained in every particular on this branch of the case, and the trial court did not err in striking from its files and records, as malicious, impertinent, and scandalous, the matters referred to.

The allegations of Alviras E. Snow's answer hereinbefore set out contain charges against Justice Bartch of criminal conspiracy as defined by our statutes, for which, if true, he could be impeached and removed from office. We have made a thorough and careful examination of the record in this case, and fail to find any evidence whatever respecting Justice Bartch that would justify the most vague or slightest suspicion of impropriety on his part respecting the commencement and prosecution of this action. No explanation was made in the trial court why these groundless and sweeping charges were made, and none has been offered in this court. Counsel for appellants, referring to these allegations in their printed brief filed in this court, say: "But we do claim, and it cannot be controverted, that there was evidence introduced tending very strongly to prove the said allegations. The summary of the evidence on this point is as follows: Bartch advised with plaintiff about bringing this suit while in Nevada, and corresponded with him on his return to Salt Lake City. When Morrison came to Salt Lake City to bring this suit, he went to Bartch's house every day until it was brought—a period of five or six days."

The only evidence on this point, as shown by the record (the official transcript of the reporter's notes), is that given by Morrison, and is as follows: "Q. Did he [Bartch] advise you to bring suit? A. No. sir; the contrary. Q. He didn't advise you not to sue? A. Yes, sir. Q. Did you tell Judge Bartch you were going to bring suit? A. I told him I thought I would bring suit. Q. Did he procure counsel for you? A.

No, sir. Q. Did he write you about it? A. No, sir. Q. You saw him here? A. I saw him at his house. Q. You went to see him before bringing suit? A. I went to pay my respects to him. Q. You went to see him before bringing suit? A. Yes, sir; three or four, or five or six days before. Q. How many times did you go to his house to see him? A. I have no recollection. Q. Four or five or six times? A. I expect so—as often as convenient. . . . Judge Bartch advised me not to sue. He asked me to see Mr. Snow, and he thought it could be straightened out and avoid a lawsuit; that a lawsuit would be expensive, perhaps, to a man in my circumstances, and that Mr. Snow was on the ground himself, and he had the benefit of legal knowledge himself, and I would have to buy and pay for it.''

The foregoing is the evidence to which we are referred by counsel for appellants in their brief to support the allegations that Justice Bartch confederated and conspired with Morrison, and used his judicial influence with him to induce him to commence this suit, and that the fruits of the litigation, if any, were to be divided between them.

Section 110. Revised Statutes, provides: ''Every person, on his admission, must take an oath to support the Constitution of the United States, and the Constitution of this State, and to faithfully discharge the duties of an attorney and counselor to the best of his knowledge and ability.''

Section 113, Revised Statutes, provides, so far as material here: '' (2) To maintain the respect due to the courts of justice and judicial officers. . . . (4) To employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never to seek to mislead the judges by any artifice or false statement of fact or law. . . . (6) To abstain from all offensive personality, and to advance no fact prejudicial to the honor or reputation of

a party or a witness, unless required by the justice of
the cause with which he is charged."

Section 120, Revised Statutes, provides: "An at-
torney and counselor may be removed or suspended by
the Supreme Court, and by the district courts, for either
of the following causes, arising after his admission to
practice: . . . (2) Willful disobedience or viola-
tion of an order of the court requiring him to do or
forbear an act connected with or in the course of his
profession, and any violation of the oath taken by him
or of his duties as such attorney and counselor."

Attorneys are officers of the court, and as such the
law imposes upon them certain duties, one of which is
to uphold and maintain the dignity of the court, and
refrain from all offensive conduct that would have a
tendency to bring it into disrepute, or weaken the con-
fidence that the people have always reposed in the ju-
diciary. These are duties and obligations that attor-
neys must recognize and observe, both in and out of
court. We do not wish to be understood that courts
and judicial officers are exempt from fair and respect-
ful criticism by members of the legal profession, or that
in their individual capacity judges possess any civil or
legal right that is not guaranteed to every other citizen.
They owe the same duties to society, and are subject to the
same restraint, as the balance of their fellowmen. They
can sue and be sued on matters relating to their private
or individual transactions and business affairs, and the
courts have no more or greater regard for their welfare
than they have for the interests of other litigants; and
attorneys have the same freedom in commenting on and
dealing with them as litigants as are allowed in the trial
of cases generally. But attorneys have no right, and it
is in violation of their sworn duties as officers of the
court for them, either as counsel or litigants in a judi-
cial proceeding, to knowingly, as in this case, make false
and defamatory charges against a party, be such party
a judge or private citizen, that would tend to humiliate,
wound his feelings, or degrade, him in the community

where he resides or is known.  When such charges are made against a judicial officer, their pernicious consequences are twofold.  They not only affect him and his standing in the community as an individual, but they tend to bring the judiciary into disrepute, and thereby interfere with the administration of justice, which it is their sworn duty to advance and uphold.

Therefore, in the interest of good government and the protection of individuals and their own dignity, it is absolutely necessary that courts exercise their power, not only to compel their officers to perform their duties in accordance with law and proper decorum, but to revoke the license of an attorney when his conduct is reprehensible, and he acts in violation of the statute, and when his retention as an officer would become a reproach to the court and a menace to its dignity and usefulness.  "The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from official ministration of persons unfit to practice in them.  Undoubtedly the power is one that ought to be exercised with great caution and ought never to be exercised except in clear cases of misconduct, which affect the standing and character of the party as an attorney.  But when such a case is shown to exist, the court ought not to hesitate, from sympathy for the individual, to protect themselves from scandal and contempt, and the public from prejudice, by removing grossly improper persons from participation in the administration of the law.  The power to do this is a rightful one, and, when exercised in proper cases, is no violation of our constitutional provisions." Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. Ed. 552.  In State ex rel. McCormic v. Winton, 11 Or. 456, 5 Pac. 337, 50 Am. Rep. 486, the court say:  "Justice to the court, protection to the public, and the honor of his profession alike reasonably demand that he act with fidelity and honesty to the interests intrusted to his care. Whenever, therefore, it is made to appear to the satisfaction of the court that an attorney has been guilty of

conduct or acts, committed inside or outside of his professional employment, which show him to be utterly unfit to practice law and to participate in the official administration of justice, the court will exercise its summary powers to disbar him.'' In Weeks on Attorneys at Law, p. 154, the author says: ''The court, too, has the power, on the ground of self-protection, outside of the common law, and outside of statutory doctrine of contempt, in cases where an attorney has shown himself unfit to be one of its officers; and such unfitness may be displayed, not only by moral delinquency, but by acts calculated and intended to injure the court.'' And again: ''It is necessary for the protection of the court, the proper administration of justice, the dignity of the profession, and for the public good and the protection of clients.''

In the case under consideration the charges made against a member of this court, as shown by the record, were evidently intended to reflect not only upon his private character as a private citizen, but upon his character and conduct as a judicial officer. These accusations having been made without any pretense of justification by a licensed attorney and his counsel, who are also officers of the court, the act was not only unprofessional. but in direct violation of the foregoing provisions of the statute. It is therefore ordered that a citation issue from this court to appellant Alviras E. Snow, W. H. Wilkins, and J. M. Bowman, requiring said parties, and each of them, to appear in this court, at the adjourned term, October 1, 1903, to show cause, if any they have, why their license as attorneys at law to practice in the courts should not be revoked for unprofessional conduct and the violation of their sworn duties as attorneys at law, or that such other proceedings.be taken as may be meet in the premises.

The judgment of the trial court is affirmed; costs to be taxed against appellants.

BASKIN, C. J., and MARIONEAUX, District Judge, concur.