Mississippi State Bar Association *v.* Wade

No. 43127 October 5, 1964 167 So. 2d 648

626

*William B. Compton, Thomas Y. Minniece,* Meridian, for appellant.

*Thomas B. Alexander, A. K. Edwards,* Mendenhall; *James M. Walker,* Fayette, for appellee.

BRADY, TOM P., J.

The petitioner-appellee was disbarred by the Chancery Court of Hinds County, Mississippi, on April 31, 1954, because of conduct dishonest, inexcusable, and wholly contrary to his responsibilities as a member of the bar. Upon appeal the Supreme Court of Mississippi affirmed the decree of the lower court on May 2, 1955, which decree is reported in 224 Miss. 197, 79 So. 2d 727.

The petitioner filed a petition for reinstatement in the Circuit Court of Hinds County, Mississippi subsequent to May 4, 1957. After an investigation by a committee of the Hinds County Bar Association which revealed that petitioner had, subsequent to his disbarment, engaged in the unlawful practice of law, this petition for reinstatement was voluntarily dismissed by petitioner.

The petitioner, who engaged in the small loan business in Hinds County subsequent to his disbarment, sold this business and moved from Hinds County to Simpson County. After establishing residence there petitioner, on December 20, 1960, filed a second petition for reinstatement to the bar, Cause No. 8,001 in the Chancery Court of Simpson County, before Chancellor Neville Patterson. This petition was likewise dismissed for the same reasons which led to the dismissal of his first petition and for additional reasons. The second dismissal occurred on July 10, 1961.

On September 28, 1962 a third petition for reinstatement was filed in the Chancery Court of Simpson County as Cause No. 8336. After proper investigation, the answer of the respondent-appellant here was filed on

February 22, 1963. A resolution of the Mississippi State Bar was filed resolving that petitioner, B. D. Wade, be opposed for reinstatement on the grounds that petitioner has not manifested genuine repentance of his conduct and has not met the necessary burden of proof showing his moral rehabilitation.

On March 5, 1963 Honorable E. A. Turnage, who was elected Chancellor in place of Chancellor Patterson who had resigned and who was elected to the office of Supreme Court Justice, heard the testimony and evidence in this cause, and subsequent thereto in vacation entered a decree on July 9, 1963, authorizing the petitioner to practice law in all the courts of the State of Mississippi. On July 15, 1963 notice of appeal from the decree was filed by the attorneys representing the Mississippi State Bar. It is the appeal from the chancery decree rendered on the third petition which now is before us.

■ ■ There are but two errors assigned: First, the court erred in concluding that petitioner Wade had in fact repented, made restitution, and had rehabilitated himself sufficiently to justify his reinstatement to the practice of law; second, the court erred in decreeing that petitioner Wade be reinstated to the practice of law. The fundamental question which is presented by the petition for reinstatement, the decree based thereon and the subsequent appeal therefrom by the respondent is whether the applicant Wade has been sufficiently rehabilitated in conduct and character since his disbarment to be safely readmitted to practice law. This question we must decide upon the record as it exists before us at the time of the decision upon that question.

■ ■ At the outset, "The rule that the Supreme Court will not reverse the judgment of the lower court on a question of fact unless it affirmatively appears upon the face of the record that the cause was decided contrary to the evidence shall not apply in cases arising

under this act, but the Supreme Court shall be the final judge of the facts, and the judgment to be rendered thereon'', Ex parte Marshall, 165 Miss. 555; Sec. 3378, Code of 1930; Secs. 8714, 8715, 8716, Code of 1942, Ann.; Const. 1890, Secs. 33, 103; State ex rel. Jones v. Laughlin, 73 Mo. 443; Winkelman v. People, 50 Ill. 449; Mattler v. Schaffner, 53 Ind. 245; Morrison v. Snow, 26 Utah, 247, 72 P. 924; People v. Goodrich, 79 Ill. 148; In re Darrow, 175 Ind. 44, 92 N.E. 369; and In re Ebbs, 150 N.C. 44, 63 S.E. 190, 19 L.R.A. (N.S.) 892, 17 Ann. Cas. 592.

 In determining whether a particular attorney has been rehabilitated and would be safe to assist in administering justice if readmitted, the primary question presented has been resolved, but there still remains another, though secondary, question which is: What will be the effect of his readmission upon the conduct of others involved in the administration of justice? ''A court of justice consists, not of the judge alone, but also of its administrative machinery, a fundamental and essential portion of which is attorneys at law'' who are officers of the court in which they practice.

''The right to practice law is not a natural or constitutional right''. It is a revocable privilege conferred upon persons who have met the basic legislative and educational requirements and are of ''good moral character''. ''An attorney's good moral character must not only appear when he is admitted to the bar, but must continue thereafter, in default of which, his license to practice may be revoked.''

''The statute does not set forth the grounds on which a disbarred attorney may be reinstated, leaving that question to the law governing it theretofore in effect, under which the question is, Is the petitioner of good moral character, and a fit and proper person to assist the court in the administration of justice?'' This quo-

tation from the Marshall case still has application today. "Or, to state it differently, Would his reinstatement be compatible with the proper respect of the court for itself, the dignity of the profession, and the safety of the public? There are four parties before the court in such a proceeding — the petitioner, the court itself, the bar, and the public." Ex parte Marshall, supra.

No man or tribunal can fully comprehend the meditations of another human heart. At best, they can be approximated only. It follows therefore that a change of heart cannot be absolutely determined. To reach a just decision is indeed a difficult task which requires the highest objectivity in evaluating all the pertinent facts. The declarations of the person whose reformation is urged are worthy of solemn consideration, but more so are his overt acts and habits which disclose any professed changes in his moral attitude, practical beliefs and conduct.

In striving to reach the proper conclusion, we will review first the testimony and evidence ultimately presented. Eleven witnesses testified in behalf of the petitioner's rehabilitation and yet none of them had a clear and concise understanding of what the petitioner had done to cause his disbarment and require his rehabilitation. Their comprehension was vague and indefinite, and only to the effect that Wade had done some thing or another that had caused his disbarment. No frank admission of the nature of his dishonest acts was made to any of his witnesses. Practically all of his witnesses expressed approval of petitioner's efforts to support his family and apparently felt that his efforts constituted not only reasonable proof of his repentance and rehabilitation but also justification for his readmission to the bar.

Although members of the Simpson County Bar had signed the second petition for his reinstatement, which stated that Wade had made restitution of all moneys

which he was charged with misappropriating and was fully rehabilitated, only two lawyers, neither of whom is a resident of Simpson County, took the stand in his behalf. First, Honorable Maurice Black, a former state representative, who attended the Jackson School of Law with petitioner, stated that he had had no business dealings whatsoever with the petitioner, and further that he could not determine from his conversations with petitioner whether he differentiated between the idea that he made mistakes in doing things he "got caught at", or if he really felt that those things were wrong and he should not have done them. The second attorney was Honorable Dan Breland, President of Tillman Finance Company. Mr. Breland testified that he had had eight or nine different transactions with petitioner Wade; that he did not follow him daily but he had entrusted him with money and that his business transactions were satisfactory. Mr. Breland had never discussed the details of his disbarment with petitioner and he based his belief that Wade was repentant also on the fact that he had watched him during the last few years and observed his eagerness to get out and make an honest living.

Except for being treasurer of the D'Lo Lions Club, to which club several of his witnesses belonged, it does not appear that Mr. Wade had any business dealings with his witnesses and neighbors of D'Lo. Petitioner did have business dealings with Mr. J. H. White of Jackson, Mississippi, one time owner of the White System, a loan agency. These relationships consisted of loans made to petitioner by the White System and notes purchased from Wade's loan agency, Acme Finance Company or Acme Collecting Agency, in passing, one of which was the Ophelia Tornes note and deed of trust on Ophelia Tornes' house, which Ophelia Tornes paid out. The amount could not be recalled, but Mr. White

remembered that it ''was for some kind of fee or something.''

Mr. White based his belief of rehabilitation on the fact that petitioner had been honest and honorable with him in every respect, and stated: ''He has really tried to make a living for that wife and family and has moved off down here where expenses are cheaper and he has done various and sundry things.''

Witness Jack Warren of the State Game and Fish Commission had no business dealings with petitioner except as an officer in the Lion's Club, and had never been told anything definite by petitioner about his disbarment except that he was trying to live a better life and trying to get back in the good graces with the Bar Association.

Two pastors testified for petitioner. First, Rev. E. L. Roberts, Pastor of the D'Lo Baptist Church, who had known Mr. Wade for about two years, but who honestly could not say whether Mr. Wade had repented or not, stated that Mr. Wade attended his church but was not a member. Rev. Roberts testified that Mr. Wade told him he had repented of the wrongs. What the wrongs were, it does not appear that Rev. Roberts was told or actually knew. The second pastor to testify was Rev. R. A. Langley, a retired pastor who was associated with petitioner for one year when Mr. Wade attended his Sunday School class. Rev. Langley testified that Mr. Wade discussed his disbarment with him perhaps a dozen times, but never told him any details of the disbarment; that Mr. Wade's deep concern was for getting back into the practice of law and this was paramount in his mind.

Three officials of the town of D'Lo testified for petitioner: Mayor Fordie Cockrell, Alderman William H. Boggan, and Town Marshall J. C. Weaver. These witnesses are neighbors and friends of petitioner. Mayor Cockrell knew ''nothing, just hearsay is all'' about the

disbarment, and based his opinion that petitioner had rehabilitated himself "because he is a church worker" and a member of the Lion's Club. This witness did not know of any office petitioner held in any church and the only community matters petitioner had dealt in were through the Lion's Club. This witness testified that Wade had just mentioned to him the disbarment, that "he did not have anything to hide or go behind anybody's back that he was ashamed of. And what he was charged with was — what he was charged with I don't know."

"Q. I believe you stated he told you that what he was charged with, part of it was true and part of it was not?

"A. I think that is right.

"Q. Uh huh. Did he ever tell you that he had made mistakes?

"A. Well . . .

"Q. Did he ever say it in those words?

"A. I don't remember, but I think we all make mistakes. As far as him saying, 'I made mistakes,' I am pretty sure he has."

- - - -

"Q. And you don't knew anything about his ethical standing in so far as the practice of law is concerned?

"A. No, sir, I don't

"Q. You just judged him as a neighbor?

"A. That's right.

"Q. And that is all?

"A. And a citizen."

Alderman Boggan knew Wade since he came to D'Lo and stated: "He has worked hard since he has been there, paid his debts, and kept his mouth shut about other people's affairs." Witness Boggan considers petitioner to be a good church worker, active in community and civic affairs and would trust him with anything he

has. The extent of Alderman Boggan's complete faith in petitioner is shown in this direct testimony.

"Q. Uh huh. You understand that he was disbarred in '54?

"A. Yes, I heard that.

"Q. Uh huh. And for conduct that is reprehensible. Now since then, would you — is it your opinion that this man has repented of that conduct, those since that he committed, repented?

"A. Just knowing, I question that he committed any misconduct.

"Q. Well, he did though.

"A. Well, he probably did."

On cross-examination we find witness Boggan testifying as follows:

"Q. Mr. Boggan, he never went into any details with you or never discussed with you his disbarment at all did he?

"A. Yes, he has discussed it with me.

"Q. And what did he say about it?

"A. Well, do I have to answer that question?

"COURT:

"Yes, sir.

"WITNESS continuing:

"A. Well, he just told me what he stated here in his petition that he and his family made restitution for the money that he was claimed to be due and that is about all.

"Q. That is about all?

"A. Yes.

"Q. Well, you made a statement a minute ago that you doubted that he ever did anything wrong?

"A. Well, the way he told it to me it did not seem very wrong. He just got in hard luck and couldn't pay at the time and it didn't look like it was too wrong.

"Q. Well, did he admit to you that he held other people's money when he should have paid it to them?

"A. I don't recall that he told me about that. I think he did say that he was due some negroes some money and he could not get it up right at the time.

"Q. And that was after the disbarment proceedings wasn't it?

"A. That was after he was disbarred."

Town Marshall Weaver testified that petitioner had never given him any trouble, that he paid his water bills, that he is a good neighbor and he found him honest; that he bought a privilege license for his wife to run a restaurant, or to collect bad debts from her home. The marshall on direct examination stated he would trust him with financial affairs. Further direct examination of Marshall Weaver discloses these facts:

"Q. Would you trust him with financial affairs?

"A. Oh, yes sir.

"Q. You heard about him being disbarred for dishonesty, didn't you, about 1954?

"A. Yes, sir, I heard about that.

"Q. Well, it's a fact.

"A. Yes.

"Q. He admitted he was dishonest?

"A. *I see. I would not know about that.* (Emphasis ours.)

"Q. Now, do you think he has rehabilitated himself since then, repented?

"A. What I mean now, before that, he might have, but since he has been in my town and it seems like it has been longer than two years that he has never done anything to repent for since he has been there and I just don't know.

"Q. He files a petition here and says he has repented of his sins and has reformed. Would you say from what you know of him that he has reformed?

"A. I would, yes, sir."

Supervisor Louis Thompson testified in behalf of petitioner that he had known petitioner four and a half

or five years; that he was a church worker and led a good life and from hearing him talk and observing him he believed him to be a good moral man and would trust him with money.

On cross-examination Thompson stated Mr. Wade had told him he had been disbarred — that that was about all he told him; that several times Mr. Wade told him he wanted to be reinstated to practice law on account of his family and taking care of his children. He never discussed with Thompson whether the things he had done were wrong and never told him he was sorry. Thompson never had any business dealings with petitioner.

Overlooking the fact that the majority of questions propounded on direct examination were suggestive or leading, we are forced to the conclusion that the testimony of these witnesses is insufficient and fails to establish the essential fact that the petitioner is penitent of the charges which caused his disbarment. None of his witnesses had any conception of the nature of the charges. Some thought the charges were ''hearsay'' statements without merit, others knew nothing about them at all. These were the witnesses Wade had talked to repeatedly about wanting to be reinstated, and with whom, except for two or three, he had had no business dealings whatsoever. It was to these witnesses he appealed for help in order to assist his family. None of them gave any valid testimony touching on his repentance because of his acts or of his determination never to repeat them.

It cannot be doubted that petitioner truly regrets his disbarment and the difficulties and labor it has entailed and that he longs to be reinstated. His witnesses likewise are more anxious for him to be reinstated than they are impressed by his remorse and rehabilitation. They did what any good neighbor in a town, small or large, would probably do for a friend

or close neighbor who desired to be gainfully employed in a more lucrative profession, but it is obvious that because of their lack of knowledge of the numerous acts of dishonesty of which the petitioner has been found guilty, because they had but little knowledge of his present endeavors and because of an almost complete lack of business dealings and intimate social relations with the petitioner, they were simply not in a position to determine whether he had actually repented and had in truth rehabilitated himself.

We consider next the acts and statements of the petitioner. The voluble assurances of the petitioner that he is completely repentant and has been rehabilitated, if they be true, would justify his reinstatement, but it is to be noted that the petitioner made the same solemn affirmations two years after his disbarment when he filed his first petition for reinstatement in May, 1957. The record discloses that his positive assertions could not have been established and shrewdly the petitioner withdrew his application for reinstatement.

On December 20, 1960, subsequent to his moving to Simpson County, the petitioner again professed that he had been rehabilitated, and again it became apparent that his sworn declarations could not be verified, but on the contrary that he had committed additional violations in that he had practiced law while disbarred and operating a loan agency. Petitioner's reluctant and vacillating confession of this new breach of legal ethics was not forthright insofar as his guilt or repentance is concerned. The sale of his loan business subsequent to his dismissal of his second petition indicates it would not be a profitable one without his practicing law therein. This second petition filed before Chancellor Neville Patterson was dismissed July 10, 1961. It appears therefore that since 1955 for a period of approximately six years the petitioner twice solemnly declared that he was repentant and had been rehabili-

tated, but the petitioner either realized that this was not so or that his conduct was such that he feared to face the test of his allegations and therefore again adroitly abandoned his contentions and dismissed his petition.

We are now asked to believe his forensic assurances of rehabilitation set forth in this, his third petition filed September 28, 1962, fourteen months subsequent to his dismissal of his second petition on July 10, 1961. The petitioner has the right to file an application for reinstatement every twelve months after being denied readmission, so this petition is statutorily timely.

An impartial analysis of Mr. Wade's testimony on direct and cross-examination, though copious, is euphemistic and lacks the unmistakable ring of sincerity. His answers are prolix and evasive, tending to confuse rather than to elucidate. He places the responsibility for the dismissal of his two former petitions for reinstatement upon his attorney and offers no explanation, but Chancellor Patterson's order of dismissal plainly states that Mr. Wade made an oral motion that his reinstatement petition be dismissed because his handling of collection accounts touched upon the unauthorized practice of law. When questioned about the filing of the collection suits petitioner attempted to place partially upon his secretary the responsibility and blame for filing the suits.

He would have the lower court and this Court believe that he has made full restitution to his clients of all moneys that he has charged with misappropriating as far as it is possible for him to do so. Two postal money order receipts for the smallest amounts wrongfully taken by petitioner, from his Negro clients, namely, Willie Barnes and Charlie Brown, in the sums of seventy-five dollars and six dollars, respectively, were introduced as evidence of his full restitution of all moneys misappropriated by him. The money order receipts are dated May 4, 1957, almost three years subsequent to

his disbarment, and were procured apparently in anticipation of the filing of his first petition for reinstatement in Hinds County. Irrespective of petitioner's timing and motives, it is well that these two clients were returned that which should never have been taken from them.

Petitioner should have also returned any sums wrongfully acquired from the heirs of James Savage, for whom he drafted a will naming himself a devisee of three lots valued at $1,300, for his services rendered during the testator's lifetime, the only service being the drafting of the will and the writing of some ten or twelve letters pertaining to insurance matters. At least a request for forgiveness by petitioner should have been made of the heirs.

Petitioner should have made restitution to C. L. and Lula Gresham, not only for any financial losses he may have caused them by signing their names to an appearance bond of one Howard T. Wallace without any authorization, but also for any part of the $1,525 bond, which he persuaded them to put up without any consideration whatsoever, which amount they forfeited for the appearance of someone in court. Again restitution and a request for forgiveness by petitioner should have been made.

Petitioner evidently feels that specifications 5 and 7 relating to J. D. Phillips and Pink Williams do not merit attention on his part insofar as repentance is concerned.

After waiting almost six years since his disbarment, he attempted to contact his client, Ophelia Tornes. This was after the Mississippi State Bar, in its answer to his first petition filed in Simpson County for reinstatement, alleged that, contrary to the allegations in his petition, he had not reimbursed Ophelia Tornes for his misappropriation of the $250 he had obtained from her. He advised Ophelia Tornes that he would "take care

of'' a white lady who was involved in a wreck with her common-law husband, Eddie Lee Tornes, and that he would pay a fine which Eddie Lee had incurred, out of the $250. Ophelia executed a note for $250 and a deed of trust on a house, which petitioner sold to the White System or to Mr. J. H. White. The record discloses that he failed to use any portion of the $250 to settle any white lady's claim against Ophelia Tornes. Moreover, the testimony indicates that there was, under the circumstances, no basis for a claim against Ophelia Tornes and that he did not pay any fine for Eddie Lee, but charged Ophelia an attorney's fee of $47.

When petitioner finally completed his search for Ophelia Tornes, he found that she was dead and thereupon procured and filed a death certificate herein showing she had died on August 31, 1959. In justification for not making an earlier attempt of restitution petitioner makes the novel contention that he could not understand what the decree required by way of reimbursement of Ophelia Tornes. This contention does not merit comment and, in addition, petitioner could have inquired of the Mississippi State Bar or the Chancellor if he was truly interested in making restitution and did not actually comprehend that part of the decree. Obviously he was not earnestly concerned with reimbursing Ophelia Tornes or her heirs. He stated he did not know who her heirs were or where they lived. Yet, the death certificate he introduced gave the names of her father, mother and son, not one of whom petitioner has attempted to locate.

For ten years petitioner is completely silent regarding the $100 check which the Chancellor found Evanglee Brown did not sign, but repentance still requires that petitioner make an accounting thereon.

 █ In conclusion, the petitioner's acts and testimony do not indicate a repentant heart. We would prefer to hold otherwise but cannot do so. No genuine

desire to make amends and restitution to those clients who trusted him and were deceived by him can be found here. It is not a penitent heart which is disclosed here, but a heart that desires primarily to again engage in the lucrative practice of law. Unlike the prodigal son, he has not frankly confessed to those he was unworthy in representing. See Luke 15:21; 10 Hastings' Encyc. of Religion and Ethics, 731.

Counsel for petitioner urge that his offenses are of slight consequence when compared to the great violation represented by the large sum of money misappropriated and involved in Ex parte Marshall, and therefore, since Marshall was reinstated, petitioner also should be reinstated.

The quality and amount of proof of repentance and rehabilitation of these two men in these two cases varies and differs so vastly that the point urged actually requires no answer. We will observe, however, that there is a great difference in character and repentance between one man who has led an exemplary life and who commands the respect and esteem of all who knew him, but who under unusual circumstances, in a moment of weakness, yields to temptation and becomes involved in the misappropriation of funds in violation of his oath as an attorney, and another man who, over the years, has repeatedly misappropriated the funds of his clients. The law recognizes this difference. Likewise the law appreciates the difference between one man who, when disbarred, mutely takes his punishment and immediately avoids even the appearance of evil and who never violates his disbarment, and in whose behalf distinguished lawyers and citizens from all over this state come forward to declare his repentance and rehabilitation, and another man who secretly but promptly violates his disbarment, and who does not voluntarily make restitution to those whom he has wronged, though he claims to have done so, who did not even confide in his friendly

witnesses the true nature and extent of his violations, and who therefore cannot be repentant and rehabilitated. Petitioner's attorneys urge that divine forgiveness has been granted and spiritual atonement made by him. We believe, however, that if he had repented and received spiritual atonement he also would have been most captious to avoid even the appearance of evil in order that he could quickly vindicate his integrity and remove the stigma which he asserts he wishes to remove, and be quickly reinstated. If truly repentant he would have first confessed to himself his violations and genuine remorse would have filled his heart. This would have been followed by a plea for divine forgiveness. Just as Zacchaeus did he would have then repaid any man from whom he had taken anything by false accusation, though perhaps not fourfold. Luke 19:8. These deeds would be evidence of true repentance and atonement. Furthermore, when his conduct thereafter was exemplary and no other violations of propriety, honesty or law took place, then he could be deemed to be and would be rehabilitated. In re Marshall, 162 Miss. 364, 138 So. 298; 2 Thornton on Attorneys, secs. 765, 767; In re Steen, 160 Miss. 874, 134 So. 67.

"In the preamble to the American Law Association's Canons of Ethics it is said that: 'In America, where the stability of courts and of all departments of government rests upon the approval of the people, it is peculiarly essential that the system for establishing and dispensing justice be developed to a high point of efficiency and so maintained that the public shall have absolute confidence in the integrity and impartiality of its administration. The future of the republic, to a great extent, depends upon our maintenance of justice pure and unsullied. It cannot be so maintained unless the conduct and the motives of the members of our profession are such as to merit the approval of all just

men.'" Also 2 Thornton on Attorneys at Law, secs. 902, 1337.

As is properly pointed out in the dissenting opinion in Ex parte Marshall at page 559, "The ability of the courts 'to establish justice, insure domestic tranquility, and promote the general welfare' depends, in a large measure, on public confidence in their integrity, the instillation and preservation of which rests equally on the judge and the attorney — on bench and bar. That confidence in the integrity of the courts may not be impaired, constitutional and statutory methods have long existed for removing therefrom not only unworthy members of the bench, but also unworthy members of the bar. To the honor of both of these branches of courts of justice, it has seldom been necessary to resort to proceedings for this purpose; and, to the honor of the bar, it can be said that it has generally measured up to its high responsibilities in this regard." See also Const. 1890, secs. 33, 103; State ex rel. Jones v. Laughlin, 73 Mo. 443; Winkelman v. People, 50 Ill. 449; Mattler v. Schaffner, 53 Ind. 245; Morrison v. Snow, 26 Utah 247, 72 P. 924; People v. Goodrich, 79 Ill. 148; In re Darrow, 175 Ind. 44, 92 N.E. 369; and In re Ebbs, 150 N.C. 44, 63 S.E. 190, 19 L.R.A. (N.S.) 892, 17 Ann. Cas. 592. "Punishment is no part of the purpose sought to be accomplished by the disbarment of an attorney; the purpose sought to be accomplished thereby being simply the eliminating from the practice of law of a person unfit therefor." It is unfortunate, but one unethical lawyer can destroy in a brief period of time much of the majestic morality of and the esteem for our courts in the administration of justice which hundreds of honest lawyers have spent lifetimes of dedicated scrupulous service in creating in the public mind.

It is our firm belief that to reinstate petitioner under the circumstances set forth in this record "is calculated to, and may, shake public confidence in the

courts and in the integrity of the legal profession, the high ideals of which it is our duty to preserve.'' Ex parte Marshall. At any time, the petitioner has the divine right which no man or tribunal can take from time to do those things which will bring about sincere repentance and genuine atonement. However, there must be an inexorable determination, at whatever cost of humiliation, effort or expense to rectify the wrongs which he has done. This is the ancient hallmark of true repentance. Genuine repentance, like courage, is free from deceit and hyprocrisy. It is devoid of defiance, self pity or resentment. Only remorse and restitution remain for the wrong done. Only under such reformation of character should reinstatement be granted. Ex parte Redmond, 120 Miss. 536, 82 So. 513; 2 Thornton on Attorneys, 902; 6 C.J. 615, sec. 97; Re Hahn, 56 Cal. App. 702, 206 Pac. 473; In re Davies, 93 Pa. 116, 39 Am. Rep. 729, and note; 95 Am. Dec. 344, note; 2 Am. St. Rep. 861, note; 48 A.L.R. 1236, note; Ann. Cas. 1912A, p. 813, note. The petitioner has not yet but perhaps ultimately may realize that he, like all other human beings, cannot go over or under, he cannot go around, the door called contrition which, like the door of hope, is never locked in an honest supplicant's face in this life, but he must go through the straight and narrow, but noble, portal of penitence, which is often humiliating, toilful and difficult to open, if he is to enter the stately mansions of rehabilitation, atonement and peace.

Not having produced creditable testimony sufficient to establish his repentance and rehabilitation, which burden of proof rests upon the petitioner, we find that the Chancellor erred in authorizing the reinstatement of the petitioner to the practice of law in all the courts of this state. The decree of the Chancery Court of Simpson County is reversed and the former decree of the Chancery Court of Hinds County disbarring petitioner

from the practice of law in this state is reaffirmed and continued in full force. In re Wellcome, 25 Mont. 131, 69 P. 836; In re Pemberton (Mont.), 63 P. 1043; Matter of Clark, 128 App. Div. 348, 112 N.Y.S. 777, 779; Miss. Code of 1942, Ann., secs, 8714, 8715, 8716; In re Smith, 19 N.W. 2d 324, 220 Minn. 197; State v. Brodson, 103 N.W. 2d 912, 11 Wisc. 2d 124.

Reversed and former judgment reaffirmed.

*Kyle, P. J., and Gillespie, McElroy, and Jones, JJ.,* concur.