In the Matter of the Application of
# HARRY R. KRAUS,
for Reinstatement as an Active Member
of the Oregon State Bar.
(SC 26690)

670 P2d 1012

John D. Ryan, Portland, argued the cause and submitted the briefs for accused.

Lee S. Aronson, Portland, argued the cause for Oregon State Bar. With him on the brief was Holmes, DeFrancq & Schulte, P.C., Portland.

Before Linde, Presiding Justice, Peterson, Roberts, Campbell, Carson and Jones, Justices.

PER CURIAM

## PER CURIAM

This proceeding is the result of a lawyer discipline case in which the petitioner lawyer was suspended from the practice of law for a period of one year, *In re Kraus,* 289 Or 661, 616 P2d 1173 (1980).[1] When petitioner made application for reinstatement the Board of Bar Governors recommended a denial of the application. We referred the matter back for a hearing on January 26, 1982 pursuant to ORS 9.525 and the case is now before us with a complete record and with a recommendation from the Trial Board and the Disciplinary Review Board that petitioner not be reinstated.

The objections to the reinstatement of petitioner made by the Oregon State Bar at the proceedings before the Trial Board, in addition to the fact that petitioner had twice been suspended,[2] are:

"The Applicant does not possess good moral character or general fitness,[3] in that the Applicant, since the commencement of his most recent suspension, has engaged in the unlawful practice of law in one or more of the following particulars:

"1. By continuing to meet with, advise and represent persons in need of legal counsel without advising them that he has been suspended from the practice of law;

---

[1] Petitioner had previously been suspended in 1964 for three years, *In re Harry R. Kraus,* 238 Or 482, 395 P2d 446 (1964).

[2] At the hearing before the Trial Board counsel for the Bar said it was the intent of the Bar that the Trial Board consider "those two cases and then what is presented today" as showing a continuing course of conduct.

[3] ORS 9.220(2)(a) and (b) provide:

"An applicant for admission as attorney must apply to the Supreme Court and show that the applicant:

"* * * * *

"(2)(a) Is a person of good moral character.

"(b) For purposes of this section and ORS 9.025, 9.070, 9.110, 9.130, 9.210, 9.250, 9.480 and 9.595, 'good moral character' means conduct not restricted to those acts that reflect moral turpitude, but rather extending to acts and conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct in question should be rationally connected to the applicant's fitness to practice law."

"2. By negotiating with adverse parties or their agents on behalf of former clients who were involved in pending legal disputes at the time of the Applicant's suspension;

"3. By making himself available to, and arranging appointments with, clients during regular office hours at his former office location;

"4. By holding himself out to the public as a licensed attorney by way of placing, allowing to be placed, or failing to remove an office sign at his former office location indicating the Applicant is a licensed attorney at law." (Footnote added.)

The Trial Board made the following findings of fact which were accepted by the Disciplinary Review Board.

### "FINDINGS OF FACT

"1. That the Applicant, during the period of his suspension from the practice of law:

"(a) Met with Janice Burns-Wolfinger, Annetta Heaton and Bach-Hoa Schesso, all of whom were in need of legal counsel, and rendered legal advice to such persons without having advised such persons that he was under suspension from the practice of law:

"(b) Represented Annetta Heaton by negotiating with opposing counsel, failed to advise such opposing counsel that he was suspended from the practice of law during such negotiations and charged Annetta Heaton a fee for such representation;

"(c) Failed to advise his former clients of his inability to further practice law as a result of his suspension;

"(d) Failed to adequately safeguard the interest of his clients in cases pending as of the commencement of his suspension by assuring an orderly transfer of such cases to other counsel;

"(e) Attempted to create the impression to the public that he was licensed to practice law by:

"(1) Failing to remove an office sign at his former office location indicating that he was a licensed attorney within a reasonable period of time;

"(2) Failing to cause the deletion of his name from the telephone yellow pages in the two years following his suspension;

"(3) Retaining his desk and books at his former office location; and

"(4)   Allowing himself to come into contact with clients of Paul Boland, Esq., and his own former clients at his former office location;

"(2)   That the Applicant has failed to sustain his burden of proving that he has demonstrated the good moral character and general fitness required for readmission to practice law in Oregon."

In our independent review of the evidence, *In re Galton,* 289 Or 565, 615 P2d 317 (1980), *In re Robeson,* 293 Or 610, 652 P2d 336 (1982), we find the following facts pertinent. Petitioner was suspended from the practice of law for the second time in September, 1980. He was a sole practitioner whose office was located in a residential community at approximately SE 44th and Woodstock in Portland; his wife performed secretarial duties for petitioner. Shortly after his suspension petitioner rented his office to Paul Boland, an attorney, who continued the employment of Mrs. Kraus as secretary. Petitioner testified he had approximately 100 active files at this time. Some of the probate files were transferred immediately to Mary Vershum, an attorney, by the probate court. Ms. Vershum also took responsibility for a few other files. Petitioner testified that he did not initiate any action systematically to inform his clients that he was suspended from the practice of law or that they should pick up their files and seek other counsel. According to the testimony of Mrs. Kraus, when clients called the office they were not told that Mr. Kraus was suspended but rather that he was no longer in the office or would not return for an extended time, and often the callers were told that Mr. Boland was an available attorney. Mr. Kraus testified his home was located near the office and that he frequently stopped by the office. With this background we turn to the three cases around which the hearing primarily revolved.

*Janice Burns-Wolfinger*

In 1979 Ms. Burns retained Mr. Kraus to represent her in an invasion of privacy claim against an advertising agency which had filmed her son for a television commercial without first obtaining permission. No action was taken until 1981 when a case was filed by Mr. Boland. Thereafter, according to Ms. Burns, in a communication between herself and Mr. Kraus he told her he had viewed the commercial and

thought there would only be a minimal recovery. When Mr. Kraus relayed to Ms. Burns a small settlement offer from the agency she contacted the Oregon State Bar because of her disappointment at the size of the offer and learned for the first time that Mr. Kraus was suspended from the practice of law. She decided to accept the settlement offer and met with Mr. Kraus at his office, was presented a release agreement by Mr. Kraus and two checks, one made out to her and the other to Mr. Paul Boland. Mr. Boland had previously endorsed the checks. Mr. Kraus did not at this time inform Ms. Burns of his suspended status.

Mr. Kraus testified that he never told Ms. Burns he was suspended but that he did inform her her file would be handled by Mr. Boland. Mr. Kraus denied reviewing the commercial and stated that it was Mr. Boland who reviewed the commercial and communicated to Ms. Burns there could only be a small settlement. Mr. Kraus did admit he was in the office when Ms. Burns came in to pick up the check, but that he was there only because his wife who was the office secretary had asked him to remain there while she ran an errand. He was instructed by Mrs. Kraus to have Ms. Burns sign the release papers and to give her the checks as per Mr. Boland's instructions which were attached to the file. Mr. Kraus maintains he did only that.

*Annetta Heaton*

Mrs. Heaton contacted Mr. Kraus in the summer of 1980 to handle her divorce. The dissolution petition was filed in August, 1980, one month before Mr. Kraus's suspension. Mrs. Heaton testified she had periodic phone communications with Mr. Kraus but that he never told her he was suspended from the practice of law. In December, 1980, Mr. Kraus discussed the file with Mr. Boland because of problems with the pendente lite order. There is evidence in the record that Mr. Kraus negotiated a property settlement with opposing counsel, Mr. Stiner, and that Mr. Stiner was unaware of his suspension at that time. In May, 1981, according to Mrs. Heaton's testimony, she met with Mr. Kraus and he presented her with a proposed property settlement from the husband and discussed it with her. According to Mr. Kraus he was in fact involved in a meeting about a property settlement agreement with Mr. Boland present but that he only made notes of

the provisions she wanted in the settlement. According to Mrs. Heaton she signed the proposed settlement on May 28, 1981, in the presence of Mr. Kraus and wrote a check for $205 for attorney fees with the payee space blank. Mr. Kraus admits printing his name in the space and endorsing the check.

Mr. Kraus testified that he did not tell Mrs. Heaton of his suspension because it would have been very demoralizing to her and would have prevented a speedy and orderly disposition of her dissolution of marriage suit.

*Bach-Hoa Schesso*

Mr. Kraus was first asked about representing Mrs. Schesso in a dissolution of marriage by a friend of Mrs. Schesso's. According to Mr. Kraus' testimony he told the friend he would be unable to help her but he would arrange an appointment with Mr. Boland and that he, Mr. Kraus, would be present at the meeting to introduce them. When Mrs. Schesso arrived at the office Mr. Boland was not present so she and the friend met with Mr. Kraus. Although Mrs. Schesso testified that at no time was she told Mr. Boland would be her attorney, Mr. Kraus testified that he made it clear he could not represent Mrs. Schesso but Mr. Boland would. Some time later Mrs. Schesso requested that papers be filed. There is a conflict in the testimony as to whether Mrs. Schesso's contact then was with Mr. Boland or Mr. Kraus, however, it was Mr. Boland who filed the papers.

When Mrs. Schesso became dissatisfied with Mr. Boland's handling of her case she called Mr. Kraus and there followed a meeting with both Mr. Boland and Mr. Kraus present. Mrs. Schesso testified that Mr. Kraus said at this meeting that he would represent her in the future but this was denied by both Mr. Kraus and Mr. Boland.

Mrs. Schesso became aware of Mr. Kraus's suspension from the practice of law when a friend contacted the Oregon State Bar. Mr. Kraus does not contend he ever told Mrs. Schesso of his suspension.

The Trial Board also heard testimony regarding other activities giving the appearance of the practice of law. A sign bearing Mr. Kraus's name and identifying him as an attorney continued to remain outside his former office for

some months after the suspension and was removed only when it was called to the attention of Mr. Boland by a member of the Bar's Committee on the Unauthorized Practice of Law. Mr. Kraus also continued to be listed in the yellow pages of the telephone directory. There was some evidence that Mr. Kraus retained personal effects in the office and that he made some use of the office.

■ Mr. Kraus argues that at most his activities indicate an exercise of poor judgment and that he should not be sanctioned for attempting to assist in resolving the problems of two existing cases or for the assistance he gave in securing an attorney to handle a dissolution of marriage. An exercise of poor judgment no doubt occurred but this does not mitigate the ample evidence that Mr. Kraus continued to practice law after he was suspended.[4] The continued practice of law after an order of this court suspending an attorney from the practice of law engenders "substantial doubts about the individual's * * * respect for * * * the laws of the state" and therefore demonstrates a lack of good moral character. ORS 9.220(2)(b).

We recognize Mr. Kraus's difficulty in disassociating himself from the office when his wife remained an employee and she continued to have contact with his former clients. And the geographical proximity of his home to the office made it more difficult to break old habits. However, we find from the evidence that petitioner deliberately placed himself in a position where he was likely to come in contact with his former clients and the clients of Mr. Boland.

Moreover, petitioner was less than forthright with his former clients regarding his suspension, and his practice of visiting the office, meeting with former clients and arranging meetings for potential clients of Mr. Boland's placed him in the position of giving the impression that he was indeed practicing law. Petitioner, in fact, admits he did not tell his former clients he was suspended from the practice of law.

---

[4] ORS 9.160 provides:

"Except for the right reserved to litigants by ORS 9.320 to prosecute or defend a cause in person, no person shall practice law or represent himself as qualified to practice law unless he is an active member of the Oregon State Bar."

Petitioner contends throughout these proceedings that neither the Bar nor this court has given guidelines to suspended attorneys on what action they should take regarding their clients upon suspension. Although Legal Ethics Opinions are only advisory in nature we point out that Opinions 106-109 have some relevance to whether a suspended attorney may continue to engage in legal work. Opinion 106 states, quoting from The Committee on Professional Ethics of the City of New York:

> "When a lawyer has been found to lack the moral qualities required for his office, and has been stripped of the privilege to practice, it is better for society that his connection with the profession be severed completely, than that the law should be a field for his personal rehabilitation."

And Opinion 107 states, "The duty of the suspended attorney * * * was to advise each of the clients that he could not further handle his case and that it would be necessary for the client to obtain another attorney."

The American Bar Association's *Standards for Lawyer Discipline and Disability Proceedings* is very specific on this subject.

> 6.11 *Notification of Clients and Counsel.* In every case in which a respondent is ordered to be disbarred or suspended for more than six months, the court should order that the respondent shall, within a prescribed period of time:

> "(a)   notify all clients and any co-counsel in pending matters that the respondent has been disbarred, suspended, or transferred to disability inactive status and consequently has been disqualified;

> "(b)   in the absence of co-counsel, notify his clients to seek legal advice elsewhere, calling attention to any urgency in seeking the substitution of another lawyer;

> "(c)   deliver to all clients being represented in pending matters any papers or other property to which they are entitled or notify them and any co-counsel of a suitable time and place where the papers and other property may be obtained, calling attention to any urgency for obtaining the papers or other property;

> "(d)   refund any part of any fees paid in advance that have not been earned;

"(e)  notify opposing counsel in pending litigation or, in the absence of such counsel, the adverse parties, of the respondent's disbarment or suspension and consequent disqualification to act as a lawyer after the effective date of such discipline or transfer to disability inactive status;

"(f)  file with the court, agency, or tribunal before which the litigation is pending a copy of the notice to opposing counsel or adverse parties;

"(g)  keep and maintain records of the steps taken to accomplish the foregoing; and

"(h)  file proof with the court and the agency of complete performance of the foregoing.

"In cases in which a respondent is to be suspended for six months or less, the court may impose similar conditions."

"COMMENTARY

"These notice provisions are necessary to ensure that the respondent's inability to practice does not prejudice the rights of existing clients or other parties, and that those who might otherwise have occasion to deal with the lawyer are made aware of his suspension or disbarment. Compliance with the notice provision is an absolute precondition for reinstatement or readmission, and failure to comply may be grounds for further discipline. See, court ordering discipline in *In the Matter of Riccio,* 391 N.Y.S. 2d 199 (Third Department, 1976); see also Standard 13.3."

We are in agreement with this policy statement and in the future we will apply the American Bar Association's suggestion that our decisions direct suspended lawyers to take appropriate action to notify clients and counsel of a suspension.

■       A suspended attorney should cover or remove any office sign. A sign identifying a law office and a person as an attorney gives the impression that one is qualified to practice and invites the public to seek legal advice. Appropriate action should be taken to prevent that from occurring.[5]

We recognize it is often impossible to have a telephone directory listing changed, particularly where the suspension is for a shorter period. However, in the case of a sole practitioner it is possible to have the service temporarily

---

[5] Cases that may be instructive on this point are *The Florida Bar v. Breed,* 368 So2d 356 (Fla 1979) and *The Florida Bar v. Brigman,* 322 So2d 556 (Fla 1975).

disconnected, reserving the same number for later use. That could have been done in this case and Mr. Boland could have secured his own phone with a separate number.

■ Mr. Kraus testified that he frequently stopped by the office and there is some evidence that he, in fact, made use of one of the offices. Continued occupancy in one's law office after being suspended from practice can well give the appearance of practicing law. We are not prepared to say that a suspended attorney may never use his office, for this, standing alone, does not indicate the continued practice of law. If all other precautions we have set out above are taken and if the suspended attorney consciously avoids contact with former clients or clients of other attorneys in the office there may be no harm in using the office for other purposes.[6] That does not appear, however, to have been the case here.

■ We point out that this court has from time to time remarked on the high standard of conduct required of persons in the legal profession. In *In re Jeffrey Steffen,* 279 Or 313, 317, 567 P2d 544 (1977) we said, "The degree of truthfulness expected from a lawyer is higher than that expected from others." The highest standard of conduct is necessary to retain the trust and confidence of the general public. *In re Albright,* 274 Or 815, 549 P2d 527 (1976). *See also In re John W. Pennington,* 220 Or 343, 348 P2d 774 (1960). Petitioner has not met this standard. We find petitioner's actions in continuing to have contact with former clients, in arranging for legal representation for an individual, in communicating with other lawyers regarding the continued processing of cases, and in failing candidly to inform his clients of his suspended status render him an unfit applicant for reinstatement.

The question now is whether a simple rejection of petitioner's application for reinstatement is sufficient. We may modify the order of the Disciplinary Review Board. ORS 9.535(3). We have warned on at least one occasion that unethical conduct has cumulative consequences. *In re Jason Lee,* 242 Or 302, 307, 409 P2d 337 (1965). Because we find that petitioner did not comply with our previous order of suspension we conclude a denial of his reinstatement application is

---

[6] *See In re Stoldt,* 37 NJ 364, 366, 181 A2d 364, 365 (1962) as representing exemplary behavior regarding the continued use of an office.

not adequate. In this case both the public and its confidence in the administration of justice are best protected by now compelling compliance with the previously imposed suspension order. The petition for reinstatement is denied and petitioner is prohibited from again petitioning for reinstatement until one year from the date of this decision and until he has successfully passed the Professional Responsibility Examination. *See* Rules for Admission of Attorneys 4.05.

The Oregon State Bar is awarded costs.