890 So.2d 40 (2003)
In the Matter of The Petition for REINSTATEMENT To The Practice of Law OF Thomas Eddy PARSONS.
No. 2001-BR-01533-SCT.
Supreme Court of Mississippi.
August 21, 2003.
Albert Necaise, Tadd Parsons, Wiggins, for appellant.
Michael B. Martz, attorney for appellee.
EN BANC.
WALLER, Justice, for the Court.
¶ 1. The petition of Thomas Eddy Parsons to be reinstated to the practice of law is again before us for consideration after we referred the petition to a special master pursuant to Rule 3 of the Rules of Discipline for the Mississippi State Bar. In re Petition for Reinstatement of Parsons, 849 So.2d 852 (Miss.2002) ("Eddy Parsons I"). While appreciative of the conclusions and recommendation of the able special master, we nonetheless deny Parsons's petition for reinstatement given the testimony adduced at the hearing that Parsons engaged in the unauthorized practice of law.

FACTS AND PROCEDURAL HISTORY
¶ 2. The following is the factual background from Eddy Parsons I:

*41 Parsons was disbarred by agreed order of disbarment on June 13, 1996, after he was convicted of two felonies in the United States District Court for the Southern District of Mississippi. Miss. Bar v. Parsons, 677 So.2d 192 (Miss.1996). The first conviction was based on one count of conspiring to possess with intent to distribute cocaine and five counts of possession with intent to distribute cocaine. Parsons was sentenced to 98 months imprisonment on each count with all sentences running concurrently. The second conviction was based on a guilty plea entered for enticing an individual to travel in interstate commerce for the purposes of prostitution in violation of the Mann Act. Parsons was sentenced to 60 months running concurrently with the 98-month drug convictions and fined $5,000. The overall sentence was later reduced to 80 months. After serving nearly six years (59 1/2 months) in prison, he was released and placed on five years supervised and reporting probation and ordered to serve 200 hours of community service. Parsons's probation was originally scheduled to end on June 5, 2005, but it has since been terminated thirty-seven months early on April 30, 2002, by the federal court.
849 So.2d at 853.
¶ 3. Parsons filed his petition for reinstatement after the termination of his probation. Noting the divergence and seeming inconsistency in the case law regarding the reinstatement of attorneys disbarred for drug convictions, we referred Parsons's petition to a special master to assess the extent of his rehabilitation. Id. at 855. We appointed the Honorable Norman L. Gillespie, now a retired chancellor, to serve as special master.
¶ 4. Prior to the hearing, general counsel for the Bar, Michael B. Martz, wrote Jack Parsons and Tadd Parsons, Eddy Parsons's father and brother, respectively, and both members of the Bar, that it had come to the Bar's attention that Eddy Parsons may have been employed in their law office.
¶ 5. It was undisputed that Eddy Parsons maintained an office in the same building as the law office occupied by his father and brother. Out of this same building, Eddy Parsons owned and operated E-Z Disposal, a waste disposal company that provided dumpsters for contractors at construction sites.
¶ 6. The November 8, 2002, hearing for the most part concentrated on determining whether Eddy Parsons engaged in the unauthorized practice of law while disbarred rather than on whether he was worthy of reinstatement from a moral and character standpoint. The Bar presented three witnesses, former secretaries of the Parsons Law Firm, who testified as to Eddy Parsons's involvement in his father's and brother's law practices.
¶ 7. Rhona Saucier was employed by the Parsons Law Firm as a secretary for approximately seven months in 2002. She performed general secretarial work and stated that Eddy Parsons dictated tapes for cases being handled by the firm and would indicate whose signature, be it his father's or brother's, should go on the document. Saucier also noted that Eddy Parsons was in the office "[j]ust about every day" and that Eddy Parsons signed his brother's name to pleadings and discovery on a couple of occasions. Also, she testified that clients' telephone calls would be sent to Eddy Parsons and that he would request law firm files so that he could discuss their cases with them.
¶ 8. Victoria Herrington was employed by the Parsons Law Firm as a secretary as well for approximately eight months. Her testimony was consistent with that of *42 Saucier. Herrington testified that she transcribed tapes from Eddy Parsons for active client files and that he would indicate whose signature belonged on a particular document. She would also transfer client telephone calls to Eddy Parsons. Herrington also noted that Eddy Parsons moved into an office closer to those occupied by his family's law firm where he met with clients.
¶ 9. The Bar's final witness was Stephanie Evans, another former secretary of the Parsons Law Firm. She also transcribed tapes dictated by Eddy Parsons and noted that he had met with clients.
¶ 10. At the close of the Bar's case, Judge Gillespie recessed the hearing until November 22, 2002, to allow Eddy Parsons to present witnesses in rebuttal to the Bar's assertion that he had engaged in the unauthorized practice of law. Sandy Scarborough, a client of the Parsons Law Firm, testified that in her dealings with the firm and to her knowledge, Eddy Parsons never gave her legal advice or worked on her case. Jimmy Scott, another client, testified to the same effect. Buster Shaw, a long-time client, frequently used the firm for work in conjunction with his real estate development business and also testified that, in his extensive dealings with the firm, Eddy Parsons never prepared a title opinion or performed any legal services for him. Eddy Parsons himself also testified that, among other things, he never signed his brother's name to any pleadings or other legal documents.
¶ 11. In his final report and recommendation, Judge Gillespie ably discussed the circumstances leading to Eddy Parsons's disbarment and the extent of Eddy Parsons's rehabilitation since his release from prison. He concluded that Eddy Parsons had sufficiently demonstrated his rehabilitation in conduct and moral character and recommended that Eddy Parsons be reinstated to the practice of law.

STANDARD OF REVIEW
¶ 12. We retain exclusive jurisdiction over matters of attorney discipline and reinstatement. Rules of Discipline for the Miss. State Bar Rule 1(a). Attorneys' petitions for reinstatement are reviewed under the de novo standard. In re Baker, 649 So.2d 850, 852 (Miss.1995). We likewise sit as the trier of fact and are not bound by any substantial evidence or manifest error rule. Id.

DISCUSSION
¶ 13. Judge Gillespie ultimately recommended that Eddy Parsons be reinstated to the practice of law upon his passage of the Mississippi Bar Examination. On the issue of unauthorized practice of law, he noted that we reinstated Michael Holleman who, at the time of his petition and reinstatement, was employed as a paralegal in Louisiana. In re Holleman, 826 So.2d 1243 (Miss.2002).
¶ 14. He also noted our resolution of a petitioner's potential unauthorized practice with respect to Ethics Opinion No. 96[1] in Williams v. Miss. State Bar Ass'n, 492 So.2d 578 (Miss.1986). In Williams, the petitioner was disbarred after pleading guilty to two drug charges. 492 So.2d at 578. In 1981, a Meridian attorney sponsored Williams's work release and employed Williams in his firm as a paralegal, law clerk, and secretary. Id. After filing his petition, Williams became aware of Ethics Opinion No. 96 but was not working for another attorney at the time. 492 *43 So.2d at 579. He never accepted employment with an attorney subsequent thereto. Id.
¶ 15. With respect to Ethics Opinion No. 96, we held:
[Retired] Justice Sugg [, the special master,] did not express an opinion on this issue, but recommended that this Court should write with reference to Ethics Opinion No. 96, which held that an attorney should not employ a disbarred or suspended attorney to work in his office. The issue is not properly before the Court at this time, since neither Williams nor his former employer, Roy Pitts, were disciplined for failure to abide by this Opinion. Therefore, we will reserve judgment on the matter until properly presented to the Court.
492 So.2d at 581.
¶ 16. Judge Gillespie likewise opined that the issue of Parsons's unauthorized practice may not be properly before this Court. Relying on Williams alone, such a conclusion is technically correct but discounts Ethics Opinion No. 171 which was rendered subsequent to Williams on June 22, 1990, and provides: "It is not proper for a disbarred attorney, whose license to practice law has been reinstated conditioned on passing the bar examination and multi-state professional responsibility examination, to be employed as a clerk or paralegal until all requirements for reinstatement are met." We find that the issue of a disbarred or suspended attorney's unauthorized practice of law is a matter to be inquired into in reinstatement proceedings since such activity evidences a disregard of and contempt for the order of disbarment or suspension.
¶ 17. Judge Gillespie noted the inconsistency of Ethics Opinion Nos. 96 and 171 with In re Holleman, 826 So.2d 1243 (Miss.2002). Michael Holleman was disbarred after being convicted of felony possession of child pornography. Id. at 1244. Subsequent to his release from custody, Holleman obtained employment with a Baton Rouge, Louisiana, law firm as a paralegal earning $60,000 per year. Id. at 1245. In assessing Holleman's worthiness to be reinstated, we cited his employment as a paralegal as a mitigating factor.[2]Id. at 1247. We ultimately reinstated Holleman unanimously. Id. at 1249.
¶ 18. While Holleman was ostensibly in violation of Ethics Opinion No. 171, the facts of that case are nonetheless distinguishable from those in the instant case. Holleman obtained employment in Louisiana, and there was no indication that he ever maintained ties with his former practice in Mississippi. On the other hand, Eddy Parsons maintained an office with his father, with whom he practiced until his disbarment, and his brother who was subsequently admitted to the Bar. Maintaining an office with a former partner could lead to the temptation to assist in legal work although Eddy Parsons contends he only used his office to run his disposal business and participate in the family corporations.[3]See David Rand, Jr., Annotation, Nature of Legal Services or Law-Related Services Which May Be Performed for Others by Disbarred or *44 Suspended Attorney, 87 A.L.R.3d 279, 1978 WL 43146 (1978 & Supp.2002) (outlining disbarred attorney's permitted and proscribed activities from research and investigation to appearing in judicial proceedings). The Bar presented credible evidence, as outlined above, that Eddy Parsons did in fact perform proscribed work such as dictating letters and pleadings, signing his brother's name to documents, and meeting with clients. While this certainly is work paralegals do on a customary basis, Parsons was less than forthcoming about the extent of his "legal work," and within the setting of his old law firm there is, at a minimum, the appearance of the practice of law in contravention of our order of disbarment.[4]
¶ 19. These close ties with a former practice were addressed by the Supreme Court of Oregon in the case of In re Kraus, 295 Or. 743, 670 P.2d 1012 (1983). Kraus had been suspended from the practice of law for one year and had applied for reinstatement. Id. at 1012. The Oregon State Bar opposed Kraus's reinstatement, alleging he had engaged in the unlawful practice of law by continuing to meet with and advise clients, negotiate with adverse parties on behalf of former clients, by arranging appointments and keeping regular office hours, and failing to remove his office sign. Id. at 1013. In denying Kraus's petition for reinstatement, the court held:
We recognize Mr. Kraus's difficulty in disassociating himself from the office when his wife remained an employee and she continued to have contact with his former clients. And the geographical proximity of his home to the office made it more difficult to break old habits. However, we find from the evidence that petitioner deliberately placed himself in a position where he was likely to come in contact with his former clients and the clients of Mr. Boland [an attorney renting space].
Id. at 1015 (emphasis added). Kraus, like Eddy Parsons, testified that he used one of the offices. On this point, the court held:
Continued occupancy in one's law office after being suspended from practicing law can well give the appearance of practicing law. We are not prepared to say that a suspended attorney may never use his office, for this, standing alone, does not indicate the continued practice of law. If all other precautions we have set out above are taken and if the suspended attorney consciously avoids contact with former clients or clients of other attorneys in the office there may be no harm in using the office for other purposes. That does not appear, however, to have been the case here.
Id. at 1017 (emphasis added).
¶ 20. In the instant case, Eddy Parsons testified that he met with his father's and brother's clients while they were waiting for their attorney but contends he never rendered legal advice. Three former secretaries of the Parsons Law Firm testified that they transcribed tapes dictated by Eddy Parsons for active firm clients. Saucier and Herrington testified that Eddy Parsons took phone calls from active clients. Herrington further testified that during her tenure as secretary, Eddy Parsons moved into an office closer to those of his father and brother.
¶ 21. At the very least, Eddy Parsons should have kept his office separate and distinct from the offices of his father and *45 brother and from their law practice. Continuing to do what is at the very least the appearance of law practice in his old office with current and former clients makes a mockery of the disbarment. There was evidence that Eddy Parsons maintained numerous commercial properties such as a hotel and shopping center, so he easily could have maintained an office elsewhere. Eddy Parsons's actions reflected a disregard of the consequences that come with disbarment.[5]
¶ 22. The Mississippi Bar Ethics Committee quoted In re Kuta, 86 Ill.2d 154, 56 Ill.Dec. 56, 427 N.E.2d 136 (1981), in Ethics Opinion No. 96 to support the austere proposition that under no circumstances can a suspended or disbarred attorney serve as a law clerk or paralegal. We find that the rule in Kuta is the minority position and that the standard expressed by the Supreme Court of Kansas to be the more prudent approach. In re Wilkinson, 251 Kan. 546, 834 P.2d 1356, 1362 (1992), allows disbarred or suspended lawyers to be employed as law clerks and paralegals under certain stringent guidelines:
The consensus is that an attorney suspended from the practice of law may obtain employment as a law clerk, providing there are certain limitations upon the suspended attorney's activities. Regarding limitations, we are persuaded the better rule is that an attorney who has been disbarred or suspended from the practice of law is permitted to work as a law clerk, investigator, paralegal, or in any capacity as a lay person for a licensed attorney-employer if the suspended lawyer's functions are limited exclusively to work of a preparatory nature under the supervision of a licensed attorney-employer and does not involve client contact. Any contact with a client is prohibited. Although not an inclusive list, the following restrictions apply: a suspended or disbarred lawyer may not be present during conferences with clients, talk to clients either directly or on the telephone, sign correspondence to them, or contact them either directly or indirectly.
(emphasis added). See also In re Mitchell, 901 F.2d 1179 (3d Cir.1990) (allowing attorney suspended from court of appeals to be employed as a law clerk); In re Mekler, 672 A.2d 23 (Del.1995); State ex rel. Oregon State Bar v. Lenske, 284 Or. 23, 584 P.2d 759 (1978). We find this to be the better standard given the requirement for reinstatement that the disbarred attorney have the "requisite ... legal learning to be reinstated to the privilege of practicing law." Rules of Discipline for the Miss. State Bar Rule 12.7. We adopt this standard here, for such carefully restricted employment would undoubtedly contribute to the disbarred attorney's rehabilitation. We further find no circumstances where it would be appropriate for a disbarred lawyer to work in his former office, for his former firm, with his former partners and associates or on files of former clients. We likewise believe public service is preferred, such as working in a legal services office. Under these restrictions we find that the public will be protected since the disbarred attorney must be under the supervision of an attorney in good standing, will have no contact, whether directly or indirectly, with clients and will be totally separated from his prior law practice.
¶ 23. Presiding Justice McRae, in his dissent, accuses us of retracting a long line of cases supposedly condoning the type of conduct upon which our denial of Parsons's petition is based. There is no long line of cases, and the issue of a disbarred lawyer *46 working in a law office has never been directly addressed. In this opinion we modify the blanket prohibition, but proscribe disbarred attorneys from meeting with clients and maintaining an office where he maintained his former practice. In Holleman, Williams, and In re Nixon, 618 So.2d 1283 (Miss.1993), the disbarred attorneys obtained employment separate and apart from their former practices. The dissent finally asserts that we placed "much emphasis" on the number of drug convictions as a basis for our denying readmission of Parsons. First, neither this opinion nor Parsons I places an emphasis on the number of drug offenses other than to give a factual background, and second, Parsons only pled guilty to the Mann Act charge; a jury found him guilty of the drug charges.

CONCLUSION
¶ 24. We find that the unauthorized practice of law is a proper matter to be raised in opposition to a disbarred attorney's reinstatement efforts. We deny the petition for reinstatement to the practice of law of Thomas Eddy Parsons. Thomas Eddy Parsons will be ineligible to file another petition for reinstatement until one year from the date of this opinion. Rules of Discipline for the Miss. State Bar Rule 12.6.
¶ 25. PETITION FOR REINSTATEMENT DENIED.
PITTMAN, C.J., SMITH, P.J., COBB AND CARLSON, JJ., CONCUR. EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY EASLEY, J. DIAZ, J., NOT PARTICIPATING.
McRAE, Presiding Justice, Dissenting:
¶ 26. This Court's holding is a total contradiction to our holding in the case of In re Holleman, 826 So.2d 1243 (Miss.2002), which was released as good law just one year ago. How can we now retract our long line of holdings and force Parsons to conform to a standard that did not exist until this very opinion. It is a slap in the face of justice and contrary to precedent to now rule that Parsons has engaged in the unauthorized practice of law. Under our Constitution due process applies to lawyers as well as other citizens. For these reasons, I dissent.
¶ 27. The majority attempts to distinguish and justify its adoption of a new legal standard by asserting that the facts surrounding Parsons's alleged practice of law show a deliberate and conscious disregard for the mandates of his disbarment since he allegedly worked for his former law firm and possibly may have had contact with former clients. The majority opines that the reasoning of this Court in Holleman, 826 So.2d 1243; In re Nixon, 618 So.2d 1283 (Miss.1993); and Williams v. Mississippi State Bar Ass'n., 492 So.2d 578 (Miss.1986), is still good law as it applies to persons who have not worked as a paralegal or legal assistant in their former law firm or with their former clients. However, the majority's characterization of Parsons's "alleged" and wholly "unproven" actions as the unauthorized practice of law in connection with his former law firm and former clients is entirely based on speculative assertions. In fact, the majority's entire opinion rests on Parsons maintaining an office in the same office building of his former law practice which creates the "appearance" that he may be continuing to practice law. The majority suggests that "at the very least," Parsons should have maintained an office in another building. Let's get real. To deny Parsons *47 reinstatement due to the "appearance" created by his office space is absurd. Furthermore, why should Parsons have to find another office building, when his family manages the office building in which he is located? Lastly, the majority by continuing to drive home the fact that Parsons essentially "hung out" in his former law office, fails to take into account that his former law partners were his brother and father. Parsons is close with his family, why shouldn't he be in their office talking with his father and brother? It is absurd for the majority to essentially deny Parsons reinstatement because he maintained an office in the same office building as his former law office and spent time during the day with his family. One of the considerations we review is whether the suspended lawyer has continued to apprise himself of the law. In a small town what better way than to go to your father and brother's law office?
¶ 28. The Mississippi Bar ("Bar") and the majority place much emphasis on Ethics Opinions No. 96 and 171 (collectively "Ethics Opinions") in support of their proposition that Parsons should not be reinstated due to the allegations that he has engaged in the unauthorized practice of law. Ethics Opinion No. 96 ("No.96") was rendered in June of 1984 and Ethics Opinion No. 171 ("No.171") was rendered in June of 1990. Since the rendering of these Ethics Opinions, this Court has at least on three separate occasions reinstated other attorneys who have during disbarment rendered legal assistance as paralegals or legal researchers. See Holleman, 826 So.2d 1243; Nixon, 618 So.2d 1283; Williams, 492 So.2d 578. In two of these reinstatement opinions, we have acknowledged No. 96, but chose not to adopt its reasoning. Nixon, 618 So.2d at 1289 n. 15; Williams, 492 So.2d at 581.
¶ 29. The majority now back tracks and adopts the reasoning and applications of these Ethics Opinions without every having done so in the past. Not only were our holdings in Holleman, Nixon, and Williams correct and well founded; but the application of these Ethics Opinions for the first time without giving Parsons notice of their applicability is absurd. The majority is not only overruling well established precedent on the issue, but also applying a new standard to Parsons regarding the characterization of legal employment during disbarment as the "unauthorized practice of law." One has to wonder why?
¶ 30. Ethics Opinions No. 96 was rendered in June of 1984. Just two years later in 1986, this Court in Williams reinstated an attorney despite the Bar's assertion that he had engaged in the unauthorized practice of law by working as a paralegal, law clerk, and secretary for an attorney and then working independently doing research. 492 So.2d at 578-79, 581. In 1977, Williams was indicted for possession of a "large quantity of drugs." Id. at 578. Williams pleaded guilty to two drug charges and was sentenced to three years' imprisonment. Id. Williams and the Bar entered into a consent order whereby Williams was disbarred. Id. After serving eight and one half months, Williams was released. Id. In 1981, Williams began working as a paralegal, law clerk, and secretary at a law firm. Id. at 578-79. He later opened his own office whereby he did legal research as an independent contractor. Id. In 1984, Williams filed a Petition for Reinstatement. Id. at 578. During this time, Williams became aware of No. 96. Id. at 579. This Court ordered Special Master Sugg to conduct a hearing on Williams' Petition for Reinstatement. Id. at 578. The Special Master recommended that the Petition for Reinstatement be denied. Id. In his report, *48 the Special Master recommended that this Court review and write with reference to No. 96. Id. at 581. We declined his invitation, since we found that the issue was not properly before the Court as "neither Williams nor his former employer were disciplined for failure to abide by this Opinion." Id. (emphasis added). Ultimately, we found that Williams had shown sufficient proof to justify reinstatement. Id.
¶ 31. So too here, the issue of "unauthorized practice of law" under No. 96 is not properly before this Court. Parsons has not been disciplined under this Ethics Opinion. The Bar's arguments concerning the application of No. 96 can only be deduced to be evidence that Parsons in fact is not rehabilitated. As will be discussed further, Parsons supposed work as a paralegal, secretary, or legal researcher does not support a denial of reinstatement.
¶ 32. In June 1990, Ethics Opinion No. 171 was rendered. In 1993, nine years after the rendering of No. 96 and three years after the rendering of No. 171, this Court in Nixon, decided that reinstatement was proper despite Nixon's work as a legal researcher and administrator during disbarment at a Louisiana law firm. 618 So.2d at 1288-89. In 1986, the Bar secured an order of suspension against Nixon. Id. at 1285. Later, in 1989, the Bar secured an order of disbarment against Nixon. Id. In 1992, Nixon filed a petition for reinstatement. Id. We stated that "[t]he fundamental question to be addressed before reinstatement is the attorney's rehabilitation in conduct and character since disbarment." Id. at 1287 (quoting Burgin v. Mississippi State Bar, 453 So.2d 689, 691 (Miss.1984) (citing Mississippi State Bar Ass'n v. Wade, 250 Miss. 625, 167 So.2d 648 (1964))). In finding that Nixon had in fact shown rehabilitation, this Court noted that Nixon had difficulty securing employment. Id. at 1288-89. Ultimately, Nixon took a job at a law firm doing research and administrative work. Id. at 1289. In making these statements, we acknowledged No. 96 in footnote 15, but did not adopt its reasoning or pass upon the appropriateness of Nixon's employment during disbarment. Id. Ultimately, we granted his petition for reinstatement. Id. As we should have.
¶ 33. In 2002, eighteen years after the rendering of No. 96 and twelve years after the rendering of No. 171, this Court in Holleman granted a petition for reinstatement despite Holleman's work as a paralegal during disbarment at a Louisiana law firm. Id. at 1246-49. In 1997, Holleman pled guilty in federal court to one count of possession of child pornography and was sentenced to serve eighteen months. Id. at 1244-45. In 1998, Holleman was disbarred. Id. Holleman subsequently moved to Louisiana in 1999 and began work as a paralegal at a law firm where he was still currently employed. Id. at 1246. In 2001, Holleman filed a Petition for Reinstatement. Id. at 1244. In support of his Petition, Holleman submitted sixty (60) letters of recommendation. Id. at 1246. In addressing reinstatement, we stated that "[t]he fundamental question to be addressed by this Court before reinstatement is the attorney's rehabilitation in conduct and character since the disbarment." Id. at 1246-47 (citing Burgin, 453 So.2d at 691; Wade, 250 Miss. 625, 167 So.2d at 648). Our findings in support of reinstatement included the following:
First, Holleman's petition clearly states the cause of his disbarment.
Second, although it only indirectly addressed the issue of pecuniary loss, the statement that "there was no victim in the crime" is sufficient in this case....

*49 Third, Holleman was ordered to pay and did pay the Bar's costs and expenses associated with its investigation and prosecution of the disbarment proceedings ... Fourth, in support of his petition for reinstatement Holleman represents that he graduated cum laude from the University of Mississippi Law School in January 1981, and engaged in full-time practice of law in state and federal courts until he took inactive status in October 1997 ... Since December 13, 1999, Holleman has been employed by the law firm of LeBlanc & Waddell as a para-legal, currently earning $60,000 a year ...
Fifth, Holleman has continued to work in the legal field since his release from federal prison. Holleman has also continued to study the law and attend continuing legal education (CLE) courses since his release ...
Sixth, the Bar has conducted an investigation as to Holleman's petition for reinstatement as to Holleman's petition for reinstatement...
As to his future plans, Holleman represented that he is satisfied with his employer in Louisiana, and if reinstated, he may continue to work for LeBlanc & Waddell as a licensed Mississippi attorney or in a branch office on the Mississippi Gulf Coast for that law firm.
Seventh, the focus of the court must be whether Holleman has rehabilitated himself since his disbarment and now possess the requisite moral character to practice law. (citations omitted). In support of his having the requisite moral character, Holleman submitted sixty letters of recommendation.
Id. at 1247-49.
¶ 34. We acknowledged that the Bar's position on reinstatement is a factor to consider, but went on to find that this Court ultimately is responsible for balancing the evidence presented and making a determination as to reinstatement. Id. at 1248. In the end, we granted Holleman's petition for reinstatement. Id. at 1249. As we should have.
¶ 35. As one can see, we did not characterize Nixon's or Holleman's legal activities during disbarment as the "unauthorized practice of law," nor did we use their legal activities as a negative factor in deciding whether reinstatement was proper. In fact, we used their legal employment during disbarment as evidence of their rehabilitation. Why now, are the activities of Parsons characterized as not only a negative factor for against reinstatement, but also as the "unauthorized practice of law"? This makes entirely no sense and lacks consistency. Additionally, the Bar and the majority place much emphasis on the number of drug offenses for which Parsons was found guilty. It is true that in the case of In re Massey, 670 So.2d 843, 845 (Miss.1996), we found Massey's petition for reinstatement not well taken and did comment on the drug offenses he committed  i.e. drug trafficking and distribution. However, we did not establish a hard and fast rule regarding the weight the particular offense committed will have upon reinstatement.
¶ 36. Here, the Special Master's Report and Recommendation indicates that Parsons and the Bar stipulated that the drugs in question were for his own personal use. Parsons is not like Massey. Parsons was not a "drug dealer" but a "drug user." Also, when Williams was arrested he had a "large quantity" of drugs and was a heavy drug user, but we still granted reinstatement. Williams, 492 So.2d at 578-79.
¶ 37. We have repeatedly stated that the appropriate inquiry for a Petition for Reinstatement is the attorney's "conduct *50 and character since the disbarment." Holleman, 826 So.2d at 1246-47 (citing Burgin, 453 So.2d at 691; Wade, 250 Miss. 625, 167 So.2d at 648). The real factors and circumstances which render reinstatement appropriate under the circumstances are those which evidence Parsons's conduct and character since his disbarment in 1996. Such evidence presented includes:
(1) Parsons served a total of fifty-seven (57) months in prison and was fined $5,000 which has been paid in full;
(2) Contrary to the majority's assertions, Parsons' probation was terminated thirty-seven (37) months early by the federal court effective April 30, 2002;
(3) It was stipulated by the parties that Parsons was not a "drug dealer" but a "drug user";
(4) While in prison, Parsons underwent forty (40) hours of drug rehabilitation;
(5) After his release, Parsons took one (1) year or five hundred (500) hours of drug rehabilitation;
(6) From the time of incarceration till April 2002, Parsons took random drug tests all of which he passed;
(7) While in prison, Parsons taught a GED program and started the legal research program at Maxwell Air Force Base;
(8) Parsons also volunteered 1,280 hours to organize and start an apprenticeship program at the Federal Prison Camp Maxwell where he worked on forty-two (42) criminal post conviction appeals, thirteen (13) civil litigations; twenty-five (25) custody and divorce disputes; and sixty-one (61) letters of inquiry for inmates;
(9) No one was injured as a result of his crimes;
(10) Parsons has completed 200 hours of community service;
(11) Parsons has paid the Bar's cost of disbarment which totaled $500;
(12) Parsons is now heavily involved in church activities and works at D-Z Disposal;
(13) Parsons submitted sixty-six (66) letters of recommendation from lawyers, bankers, public officials, and preachers; and
(14) Testimony at trial concerning Parsons legal activity after disbarment was conflicting.
(emphasis added). Under these facts, the Special Master found reinstatement appropriate and so should we.
¶ 38. Eddy Parsons has presented ample evidence of his rehabilitation. Again, the majority's decision seems to hinge on the fact that Parsons office space was too close in proximity to his father and brother's law office. Specifically, the majority states that:
At the very least, Eddy Parsons should have kept his office separate and distinct from the offices of his father and brother and from their law practice. Continuing to do what is at the very least the appearance of law practice in his old office with current and former clients makes a mockery of the disbarment. There was evidence that Eddy Parsons maintained numerous commercial properties such as a hotel and shopping center, so he easily could have maintained an office elsewhere. Eddy Parsons's actions reflected a disregard of the consequences that come with disbarment.
Maj. Op. ¶ 21 (footnote omitted). How does this fact make Parsons guilty of the unauthorized practice of law and not eligible for reinstatement? Furthermore, the only uncontradicted evidence which was presented which tends to show that Parsons was in any way involved with his father and brother's practice of law during this disbarment, was the fact that his office *51 space was in the same building and individuals had seen him around his father and brother's law office. The witnesses called by the Bar which testified that Parsons had drafted documents and met with clients were all former employees of his brother and as such their credibility is no doubt called into question. Indeed the Special Master who heard the witnesses and was in the best position to weigh their credibility found that Parsons should be reinstated.
¶ 39. Lastly, in its adoption of a new legal standard, the majority finds support in the holding of the Oregon Supreme Court, In re Kraus, 295 Or. 743, 670 P.2d 1012 (1983). However, the majority fails to give a full and accurate rendition of the facts and holding in Kraus. In Kraus, the Oregon Supreme Court denied Kraus's petition for reinstatement after finding that he continued to have contact with former clients, arranged for legal representation for an individual, communicated to other attorneys regarding continued processing of cases, and failed candidly to inform clients of suspended status. Id. at 1017. The facts recited in Kraus, included the following:
The objections to the reinstatement of petitioner made by the Oregon State Bar
at the proceedings before the Trial Board, in addition to the fact that petitioner had twice been suspended, are:
"The Applicant does not possess good moral character or general fitness, in that the Applicant, since the commencement of his most recent suspension, has engaged in the unlawful practice of law in one or more of the following particulars:
1. By continuing to meet with, advise and represent persons in need of legal counsel without advising them that he has been suspended from the practice of law;
2. By negotiating with adverse parties or their agents on behalf of former clients who were involved in pending legal disputes at the time of the Applicant's suspension;
3. By making himself available to, and arranging appointments with, clients during regular office hours at his former office location;
4. By holding himself out to the public as a licensed attorney by way of placing, allowing to be placed, or failing to remove an office sign at his former office location indicating the Applicant is a licensed attorney at law."
(Footnote added.)
The Trial Board made the following findings of fact which were accepted by the Disciplinary Review Board:
FINDINGS OF FACT
1. That the Applicant, during the period of his suspension from the practice of law:
(a) met with Janice Burns-Wolfinger, Annetta Heaton and Bach-Hoa Schesso, all of whom were in need of legal counsel, and rendered legal advice to such persons without having advised such persons that he was under suspension from the practice of law;
(b) Represented Annetta Heaton by negotiating with opposing counsel, failed to advise such opposing counsel that he was suspended from the practice of law during such negotiations and charged Annetta Heaton a fee for such representation;
(c) Failed to advise his former clients of his inability to further *52 practice law as a result of his suspension;
(d) Failed to adequately safeguard the interest of his clients in cases pending as of the commencement of his suspension by assuring an orderly transfer of such cases to other counsel;
(e) Attempted to create the impression to the public that he was licensed to practice law by:
(1) Failing to remove an office sign at his former office location indicating that he was a licensed attorney within a reasonable period of time;
(2) Failing to cause the deletion of his name from the telephone yellow pages in the two years following his suspension;
(3) Retaining his desk and books at his former office location; and
(4) Allowing himself to come into contact with clients of Paul Boland, Esq., and his own former clients at his former office location;
(2) That the Applicant has failed to sustain his burden of proving that he has demonstrated the good moral character and general fitness required for readmission to practice law in Oregon.
In our independent review of the evidence, (citations omitted), we find the following facts pertinent. Petitioner was suspended from the practice of law for the second time in September, 1980. He was a sole practitioner whose office was located in a residential community at approximately SE 44th and Woodstock in Portland; his wife performed secretarial duties for petitioner. Shortly after his suspension petitioner rented his office to Paul Boland, an attorney, who continued the employment of Mrs. Kraus as secretary. Petitioner testified he had approximately 100 active files at this time. Some of the probate files were transferred immediately to Mary Vershum, an attorney, by the probate court. Ms. Vershum also took responsibility for a few other files. Petitioner testified that he did not initiate any action systematically to inform his clients that he was suspended from the practice of law or that they should pick up their files and seek other counsel. According to the testimony of Mrs. Kraus, when clients called the office they were not told that Mr. Kraus was suspended but rather that he was no longer in the office or would not return for an extended time, and often the callers were told that Mr. Boland was an available attorney. Mr. Kraus testified his home was located near the office and that he frequently stopped by the office. With this background we turn to the three cases around which the hearing primarily revolved.
Janice Burns-Wolfinger
In 1979 Ms. Burns retained Mr. Kraus to represent her in an invasion of privacy claim against an advertising agency which had filmed her son for a television commercial without first obtaining permission. No action was taken until 1981 when a case was filed by Mr. Boland. Thereafter, according to Ms. Burns, in a communication between herself and Mr. Kraus he told her he had viewed the commercial and thought there would only be a minimal recovery. When Mr. Kraus relayed to Ms. Burns a small settlement offer from the agency she contacted the Oregon State Bar because of her disappointment at the size of the offer and learned for the first time that Mr. Kraus was suspended from the practice of law. She decided to accept *53 the settlement offer and met with Mr. Kraus at his office, was presented a release agreement by Mr. Kraus and two checks, one made out to her and the other to Mr. Paul Boland. Mr. Boland had previously endorsed the checks. Mr. Kraus did not at this time inform Ms. Burns of his suspended status.
Mr. Kraus testified that he never told Ms. Burns he was suspended but that he did inform her her file would be handled by Mr. Boland. Mr. Kraus denied reviewing the commercial and stated that it was Mr. Boland who reviewed the commercial and communicated to Ms. Burns there could only be a small settlement. Mr. Kraus did admit he was in the office when Ms. Burns came in to pick up the check, but that he was there only because his wife who was the office secretary had asked him to remain there while she ran an errand. He was instructed by Mrs. Kraus to have Ms. Burns sign the release papers and to give her the checks as per Mr. Boland's instructions which were attached to the file. Mr. Kraus maintains he did only that.
Annetta Heaton
Mrs. Heaton contacted Mr. Kraus in the summer of 1980 to handle her divorce. The dissolution petition was filed in August, 1980, one month before Mr. Kraus's suspension. Mrs. Heaton testified she had periodic phone communications with Mr. Kraus but that he never told her he was suspended from the practice of law. In December, 1980, Mr. Kraus discussed the file with Mr. Boland because of problems with the pendente lite order. There is evidence in the record that Mr. Kraus negotiated a property settlement with opposing counsel, Mr. Stiner, and that Mr. Stiner was unaware of his suspension at that time. In May, 1981, according to Mrs. Heaton's testimony, she met with Mr. Kraus and he presented her with a proposed property settlement from the husband and discussed it with her. According to Mr. Kraus he was in fact involved in a meeting about a property settlement agreement with Mr. Boland present but that he only made notes of the provisions she wanted in the settlement. According to Mrs. Heaton she signed the proposed settlement on May 28, 1981, in the presence of Mr. Kraus and wrote a check for $205 for attorney fees with the payee space blank. Mr. Kraus admits printing his name in the space and endorsing the check.
Mr. Kraus testified that he did not tell Mrs. Heaton of his suspension because it would have been very demoralizing to her and would have prevented a speedy and orderly disposition of her dissolution of marriage suit.
Bach-Hoa Schesso
Mr. Kraus was first asked about representing Mrs. Schesso in a dissolution of marriage by a friend of Mrs. Schesso's. According to Mr. Kraus' testimony he told the friend he would be unable to help her but he would arrange an appointment with Mr. Boland and that he, Mr. Kraus, would be present at the meeting to introduce them. When Mrs. Schesso arrived at the office Mr. Boland was not present so she and the friend met with Mr. Kraus. Although Mrs. Schesso testified that at no time was she told Mr. Boland would be her attorney, Mr. Kraus testified that he made it clear he could not represent Mrs. Schesso but Mr. Boland would. Some time later Mrs. Schesso requested that papers be filed. There is a conflict in the testimony as to whether Mrs. Schesso's contact then was with Mr. Boland or Mr. Kraus, *54 however, it was Mr. Boland who filed the papers.
When Mrs. Schesso became dissatisfied with Mr. Boland's handling of her case she called Mr. Kraus and there followed a meeting with both Mr. Boland and Mr. Kraus present. Mrs. Schesso testified that Mr. Kraus said at this meeting that he would represent her in the future but this was denied by both Mr. Kraus and Mr. Boland.
Mrs. Schesso became aware of Mr. Kraus's suspension from the practice of law when a friend contacted the Oregon State Bar. Mr. Kraus does not contend he ever told Mrs. Schesso of his suspension.
The Trial Board also heard testimony regarding other activities giving the appearance of the practice of law. A sign bearing Mr. Kraus's name and identifying him as an attorney continued to remain outside his former office for some months after the suspension and was removed only when it was called to the attention of Mr. Boland by a member of the Bar's Committee on the Unauthorized Practice of Law. Mr. Kraus also continued to be listed in the yellow pages of the telephone directory. There was some evidence that Mr. Kraus retained personal effects in the office and that he made some use of the office.
Id. at 1012-15 (emphasis added). After reviewing these facts, the Court found that Kraus had engaged in the unauthorized practice of law which supported a denial of reinstatement. In so holding, the Oregon Supreme Court found the following determinative:
We recognize Mr. Kraus's difficulty in disassociating himself from the office when his wife remained an employee and she continued to have contact with his former clients. And the geographical proximity of his home to the office made it more difficult to break old habits. However, we find from the evidence that petitioner deliberately placed himself in a position where he was likely to come in contact with his former clients and the clients of Mr. Boland.
Moreover, petitioner was less than forthright with his former clients regarding his suspension, and his practice of visiting the office, meeting with former clients and arranging meetings for potential clients of Mr. Boland's placed him in the position of giving the impression that he was indeed practicing law. Petitioner, in fact, admits he did not tell his former clients he was suspended from the practice of law....
[I]n the future we will apply the American Bar Association's suggestion that our decisions direct suspended lawyers to take appropriate action to notify clients and counsel of a suspension....
A suspended attorney should cover or remove any office sign. A sign identifying a law office and a person as an attorney gives the impression that one is qualified to practice and invites the public to seek legal advice. Appropriate action should be taken to prevent that from occurring.
We recognize it is often impossible to have a telephone directory listing changed, particularly where the suspension is for a shorter period. However, in the case of a sole practitioner it is possible to have the service temporarily disconnected, reserving the same number for later use. That could have been done in this case and Mr. Boland could have secured his own phone with a separate number.
Mr. Kraus testified that he frequently stopped by the office and there is some evidence that he, in fact, made use of one of the offices. Continued occupancy *55 in one's law office after being suspended from practice can well give the appearance of practicing law. We are not prepared to say that a suspended attorney may never use his office, for this, standing alone, does not indicate the continued practice of law. If all other precautions we have set out above are taken and if the suspended attorney consciously avoids contact with former clients or clients of other attorneys in the office there may be no harm in using the office for other purposes. That does not appear, however, to have been the case here....
We find petitioner's actions in continuing to have contact with former clients, in arranging for legal representation for an individual, in communicating with other lawyers regarding the continued processing of cases, and in failing candidly to inform his clients of his suspended status render him an unfit applicant for reinstatement.
Id. at 1015-17 (emphasis added).
¶ 40. As one can clearly see, there are little factual similarities between the circumstances presented in Kraus and the present circumstances. The more than apparent differences include the following:
(1) This was Kraus' second (2) suspension. This is Parsons's first (1) suspension;
(2) There was more than sufficient evidence to show that Kraus had met and consulted with two clients and thereafter provided both legal advice. There is only speculation that Parsons may have given legal advice to clients of his brother and/or father;
(3) After suspension, Kraus maintained his old office in his former law office. Parsons's office was not "in" his former law office, but rather in the same building;
(4) Kraus never contacted any of his 100 clients to inform them of his suspension. In fact, some of the clients who became aware of his suspension learned of it through the Oregon Bar. There is no evidence regarding whether Parsons contacted his clients to inform them of his suspension. However, there is no evidence contrary to any assertion that he did in fact terminate his employment relationship with such client;
(5) Kraus maintained a sign outside his law office listing himself as an attorney. There is no evidence that Parsons former firm kept a sign listing Parsons as a member of the firm;
(6) After suspension, Kraus kept his attorney listing in the yellow pages. There is no evidence that Parsons has continued to advertise as an attorney;
(7) Kraus negotiated a divorce property settlement with another attorney without ever informing the attorney that he was suspended from the practice of law. There is no evidence that Parsons has ever involved himself in settlement negotiations of this nature; and
(8) Kraus accepted payment, in the form of a check, from a client for the performance of legal services. There is no evidence that Parsons has been paid by a client or his former law firm for the performance of legal services.
The Kraus Court looked at the above facts and found reinstatement inappropriate. The majority looks at one fact, the proximity of Parsons's office to his former law office, and arbitrarily denies reinstatement.
¶ 41. Additionally, the cut and dry law the majority seems to find in Kraus, is just not there. The Kraus Court did not find that continuing to keep an office in your former firm is per se reason for a denial of a petition for reinstatement. In fact, the Court acknowledged that under some circumstances it would not been inappropriate for a disbarred and/or suspended attorney to maintain an office in his former law *56 office. Id. at 1017. The Court specifically stated that:
Continued occupancy in one's law office after being suspended from practice can well give the appearance of practicing law. We are not prepared to say that a suspended attorney may never use his office, for this, standing alone, does not indicate the continued practice of law. If all other precautions we have set out above are taken and if the suspended attorney consciously avoids contact with former clients or clients of other attorneys in the office there may be no harm in using the office for other purposes.
Id. (emphasis added). Additionally, the thrust of the Oregon Supreme Court's decision in Kraus was the consideration of the fact that this was Kraus's second suspension and that there were numerous reasons justifying its denial of reinstatement besides his occupation of office space in his former law office. Id. at 1015-17.
¶ 42. The majority here also cites In re Wilkinson, 251 Kan. 546, 834 P.2d 1356 (1992), and adopts the Kansas Supreme Court's standard regarding a disbarred and/or suspended attorney's continued employment in the legal field. While the principles adopted in Wilkinson seem to be a fair and a predictable guideline, the majority's application of this guideline as to Parsons, when he has had no notice of such standard, is reprehensible. Furthermore, since the Wilkinson standard is contrary to our precedent on this issue, the application of the Wilkinson standard is not appropriate without first providing the public with notice of its applicability.
¶ 43. For these reasons, I dissent.
EASLEY, J., JOINS IN PART.
NOTES
[1] Ethics Opinion No. 96, rendered June 7, 1984, provides: "It is not proper for an attorney to allow a disbarred or suspended attorney to work as a paralegal or legal assistant in the attorney's law office."
[2] It is worth noting that the Bar supported Holleman's petition for reinstatement, and the opinion reinstating him never mentioned Ethics Opinion Nos. 96 and 171.
[3] There was also testimony that Eddy Parsons was consulted regarding business and legal strategies to be taken by the corporations of which he was a shareholder and drafted deeds in conjunction therewith. Such activities are not problematical because the unauthorized practice of law statute, Miss.Code Ann. § 73-3-55 (2000 & Supp.2002), excepts from the definition work performed for one's self or "in which he may own an interest."
[4] For example, Herrington testified that Eddy Parsons instructed her in the presence of the client to make a change to a warranty deed. The client, Buster Shaw, contradicted the tone of the exchange but not the fact that Eddy Parsons met and discussed firm business with an active client.
[5] The Bar could have also sought to have Parsons found in contempt of the disbarment order. Rules of Discipline for the Miss. State Bar Rule 11(e).